**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**
EASTERN DIVISION

| | | |
|---|---|---|
| Kenneth A. Carter, Robert J. Kurek, John McFawn, Paul L. Miles, Adolph F. Rivas, Curlee Thomas and Q.C. Williams, Jr., | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) ) | 08CV7169 |
| Pension Plan of A. Finkl & Sons Co. for Eligible Office Employees, | ) ) ) | Judge Pallmeyer |
| A. Finkl & Sons Co., a Delaware Corporation, | ) ) | Magistrate Judge Cole |
| Joseph E. Curci, Steve Denten, and Bruce Liimatainen | ) ) ) | |
| Defendants | ) | |

## <u>MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Sarah A. Zielinski (Ill. Bar No. 6294156)
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
(312) 849-8288 (Telephone)
(312) 698-4598 (Facsimile)
szielinski@mcguirewoods.com

James P. McElligott, Jr. (Va. Bar. No. 14109)
Regina J. Elbert (Va. Bar No. 71118)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-4329 (Telephone)
(804) 698-2111 (Facsimile)
jmcelligott@mcguirewoods.com
relbert@mcguirewoods.com

*Counsel for Defendants*

November 20, 2009

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ..................................................................................................... 1

FACTS AND PROCEDURAL HISTORY ............................................................... 2

ARGUMENT ............................................................................................................ 2

    I.     **The Standard of Review Applicable to All Counts Is "Arbitrary and Capricious."** ................................................................................................. 2

    II.    **Defendants Are Entitled to Summary Judgment as to Count I Because the Plan Administrator Did Not Abuse Its Discretion in Denying Plaintiffs' Claims for Immediate Payment of Retirement Benefits** ....... 3

        A.    Section 11.6 Is of No Effect Because the Plan Was Not Terminated ........ 4

        B.    With Few Exceptions, the Internal Revenue Code Prohibits Pension Distributions to Active Employees ............................................. 5

        C.    The Decision to Terminate an ERISA Pension Plan Is Entirely Within the Sponsor's Authority ................................................................. 7

        D.    Participants Have No Right to Sue to Compel a Plan Termination ........... 8

        E.    No Law Requires that the Termination Process Must Be Completed Once It Has Begun ................................................................. 9

            1.    The consequence of an incomplete pension plan termination is that the plan remains an ongoing plan ................. 11

            2.    Employers must have flexibility to withdraw from the termination process ................................................................... 11

            3.    The PBGC confirmed that Finkl was entitled to withdraw from the termination process ..................................................... 12

            4.    The IRS likewise acknowledges that the termination process may not be completed and has approved Finkl's repeal of Amendment No. 1 ...................................................... 14

        F.    The Plan Gave Finkl the Right to Amend the Plan By Repealing Section 11.6 ............................................................................................ 14

        G.    The Anti-Cutback Rules Did Not Apply to Plan Section 11.6 ............... 15

    III.    **Defendants Are Entitled to Summary Judgment as to Count II** ................. 17

        A.    The Plan Administrator Timely Processed the Claims It Received ........ 17

        B.    Miles and McFawn Did Not Seek Review by the Plan Administrator of the Claims They Now Raise in Count III .................... 17

    IV.    **Defendants Are Entitled to Summary Judgment as to the "Special Bonus" Claim of Count III** ........................................................................... 18

**V.      Defendants Are Entitled to Summary Judgment on the Miles QDRO Claim**................................................................................................**20**

     A.      Miles's QDRO Claim, as Described in Plaintiffs' Response to Defendants' Motion to Dismissed, Is Moot ..........................................20

     B.      Miles Never Presented His QDRO Claim to the Plan Administrator......21

     C.      The Court Cannot Adjudicate the Claim Without Esther Miles..............22

**VI.     Defendants Are Entitled to Summary Judgment as to McFawn's Claim**......................................................................................................**23**

     A.      McFawn Has Not Exhausted the Plan's Administrative Remedies ........23

     B.      McFawn Has Presented No Evidence That His Pension Is Incorrect......24

**CONCLUSION**..........................................................................................................**25**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Akers v. Palmer*,
71 F.3d 226 (6th Cir. 1995)..................................................................... 8

*Beck v. PACE Int'l Union*,
551 U.S. 96 (2007) ........................................................................ 8, 11

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322-23 (1986)..................................................................... 2

*Clifford v. Patterson Cos.*,
2009 U.S. Dist. LEXIS 107635 (N.D. Ill. 2009) ................................................ 24

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101, 109 S. Ct. 948 (1989)............................................................ 3

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)................................................................7, 8, 9, 14

*Insolia v. Philip Morris Inc.*,
216 F.3d 596, 598 (7th Cir. 2000) ............................................................ 24

*Krolnik v. Prudential Ins. Co. of Am.*,
570 F.3d 841 (7th Cir. 2009)................................................................... 3

*LTV Steel Co. v. United States*,
215 F.3d 1275 (Fed. Cir. 2000)................................................................ 16

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134 (1985)........................................................................... 9

*Page v. Bancroft Neurohealth, Inc.*,
575 F. Supp. 2d 664 (E.D. Pa. 2008) .......................................................... 14

*Perlman v. Swiss Bank Corp.*,
195 F.3d 975 (7th Cir. 1999)................................................................... 3

*Ruttenberg v. United States Life Ins. Co.*,
413 F.3d 652 (7th Cir. 2005)................................................................. 21

*Zehrung v. UAW Local 663*, 269 Fed. Appx. 585, 588 (7th Cir. 2008),
413 F.3d 652 (7th Cir. 2005).................................................................. 2

iv

**INTERNAL REVENUE CODE AND REGULATIONS THEREUNDER**

26 U.S.C. § 401 ........................................................................................ 7

26 U.S.C. § 411 .................................................................................... 1, 15

26 C.F.R. § 1.401-1 ............................................................................... 5, 7

26 C.F.R. § 1.401(a)-1 .......................................................................... 5, 6

26 C.F.R. § 1.411(d)-3 ......................................................................... 1, 15

26 C.F.R. § 1.411(d)-4 ............................................................................. 15

26 C.F.R. § 1.416-1 ................................................................................. 10

**ERISA AND REGULATIONS THEREUNDER**

29 U.S.C. § 1054 .................................................................................. 1, 15

29 U.S.C. § 1102 ..................................................................................... 14

29 U.S.C. § 1132 ..................................................................................... 1, 8

29 U.S.C. § 1341 ........................................................................... 8, 9, 10, 11

29 U.S.C. §§ 1341-1371 ............................................................................. 8

29 U.S.C. § 1342 ....................................................................................... 8

29 C.F.R. § 4041.23 .................................................................................. 9

29 C.F.R. § 4041.28 ................................................................................. 10

29 C.F.R. § 4041.29 ................................................................................. 13

29 C.F.R. § 4041.31 ............................................................................... 9, 13

**FEDERAL RULES**

Fed. R. Civ. P. 8 ..................................................................................... 20

Fed. R. Civ. P. 19 ................................................................................... 23

Fed. R. Civ. P. 56 ..................................................................................... 2

**OTHER AUTHORITIES**

Rev. Rul. 89-87, 1989-2 C.B. 81 (1989) ........................................... 9, 10, 14

Rev. Rul. 74-254, 1974-1 C.B. 91 (1974)................................................................ 5, 6

IRS Notice 2007-69 (2007)...................................................................................... 5, 6

Treas. Dec. Int. Rev. 9325 (2007) .......................................................................... 5, 6

PBGC Website ........................................................................................................... 13

Internal Revenue Manual 7.12.1.2.3(4)-(5) ............................................... 9, 10, 11, 14

2008 Instructions to IRS Annual Return/ Report of Employee Benefit Plan (Form 5500).......... 10

## INTRODUCTION

Plaintiffs bring three counts, each of which is a benefit claim arising under 29 U.S.C. § 1132(a)(1)(B).  In Count I, Plaintiffs allege that Amendment No. 2 "worked or attempts to work a reduction in each of Plaintiffs' accrued benefits and/or other rights under the Plan" and violates Plan Section 11.1(a) and the anti-cutback rules contained in 29 U.S.C. § 1054(g)(1) & (2)(B), 26 U.S.C. § 411(d)(6)(B)(ii) and 26 C.F.R. § 1.411(d)-3(b)(1)(i).  (Complaint, ¶ 29.)[1]  This count fails because Defendants have not violated any provision of the Internal Revenue Code (the "Code"), the Employee Retirement Income Security Act ("ERISA"), or the Pension Plan of A. Finkl & Sons Co. for Eligible Office Employees (the "Plan") by repealing Plan Amendment No. 1 and continuing the Plan as an ongoing pension plan.  Both the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") – the federal agencies charged with overseeing pension plans and their terminations – have recognized the right of A. Finkl & Sons Co. ("Finkl") to do so and specifically approved Finkl's revocation of Amendment No. 1.

Count II requests the Court to order the Plan administrator to process Plaintiffs' benefit claims in accordance with the Plan's administrative claims procedure.  Because the undisputed facts show that Plaintiffs were given a full and fair review of each of the benefit claims they submitted, this count must also be dismissed.

Count III contains three claims.  Count III alleges that Plaintiffs' benefit estimates have been miscalculated because special bonuses have been excluded, that Plaintiff Miles's qualified domestic relations order has been misinterpreted, and that Plaintiff McFawn has not received credit for "a recurring cost-of-living adjustment, a recurring housing allowance, and/or vacation pay."  (Complaint, ¶ 33.)   The first claim, that Plaintiffs' special bonuses were improperly

---

[1] References to the "Complaint" refer to the Corrected Second Amended Complaint, except where otherwise noted.

excluded from their pension calculations, fails under the plain language of the Plan.  The second and third claims, which relate solely to benefits claimed by Paul Miles and John McFawn, must be dismissed because these Plaintiffs have not yet engaged or exhausted their administrative remedies under ERISA.  In addition, Miles has failed to join or timely move to join his former spouse, who is a necessary party to his claim.  The undisputed material facts show that Plaintiffs are not entitled to relief, and that Defendants are entitled to summary judgment on all counts.

## FACTS AND PROCEDURAL HISTORY

Defendants set forth the relevant facts in their Statement of Undisputed Material Facts ("SOUF"), filed herewith.  Plaintiffs commenced the present litigation on December 15, 2008.  Plaintiffs amended their complaint on January 26, 2009, and Defendants answered on March 27, 2009.  Plaintiffs again amended their complaint on June 30, 2009 and later filed a Corrected Second Amended Complaint on July 6, 2009.  Defendants answered the Corrected Second Amended Complaint on July 16, 2009.  Defendants filed a motion to dismiss the claims raised in paragraphs 33(b) and 33(c) of Count III of the Complaint on July 16, 2009.  Defendants now move for summary judgment with respect to all counts.

## ARGUMENT

A movant is entitled to summary judgment in accordance with Fed. R. Civ. P. 56 "where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  *Zehrung v. UAW Local 663*, 269 Fed. Appx. 585, 588 (7th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  As discussed below, the material, undisputed facts show that Defendants are entitled to judgment as a matter of law on all counts.

**I.     The Standard of Review Applicable to All Counts Is "Arbitrary and Capricious."**

The Seventh Circuit recently held that, where the Plan Administrator's determination of

an ERISA benefit claim is subject to deference, the applicable standard of review is "arbitrary and capricious." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948 (1989); *Perlman v. Swiss Bank Corp.*, 195 F.3d 975 (7th Cir. 1999). "[I]f the plan establishes discretionary authority then review will be deferential." *Perlman*, 195 F.3d at 980.

The Finkl Plan includes the requisite discretionary authority. Plan Section 9.5 grants the Pension Committee "the exclusive right to exercise the following powers and duties in its complete discretion…[including to] interpret the terms and provisions of the Plan [and to] decide such questions as may arise in connection with the operation of the Plan." (Exh. 1, Bates No. 00515-00516).[2] Therefore, deferential review is appropriate, and the Plan administrator's decisions may be overturned only if they are found to have been "arbitrary and capricious."[3]

## II. Defendants Are Entitled to Summary Judgment as to Count I Because the Plan Administrator Did Not Abuse Its Discretion in Denying Plaintiffs' Claims for Immediate Payment of Retirement Benefits.

The Plan is a retirement plan, designed to provide pensions to former employees of the Company. Plaintiffs are active employees, not retirees, and therefore are not yet entitled to receive pensions under the plain terms of the Plan.[4] (SOUF, ¶ 32.)

Nevertheless, Plaintiffs claim entitlement to an immediate distribution of their benefits based on the terms of Section 11.6 of the Plan, which was added to the Plan by Amendment No. 1. Although Section 11.6 was repealed by Amendment No. 2, Plaintiffs argue that the anti-

---

[2] Unless otherwise noted, exhibits cited in this memorandum are attached to the Declaration of Steven D. Denten in support of this motion ("Denten Decl."), which is attached to the SOUF.
[3] By letter of March 26, 2009, the Plan administrator denied benefit claims submitted by Plaintiffs (SOUF, ¶ 30.) The administrative claims history is detailed in the SOUF.
[4] Plaintiff Robert Kurek was an active employee when this litigation commenced but has since retired, effective June 1, 2009. Now that he has retired, Kurek has requested and begun receiving pension benefits from the Plan. (SOUF, ¶ 32.)

cutback rules of ERISA and the Code render Amendment No. 2 invalid. But this argument ignores the language of Section 11.6, which stated that the section applied only to a distribution made on account of a termination of the Plan "effective February 28, 2007," which termination never occurred. (Exh. 1, Bates No. 00541.)[5] Therefore, even if Section 11.6 had not been repealed, Plaintiffs would not be entitled to the plan termination distributions described in Section 11.6 because that provision of the Plan was never triggered. Plaintiffs do not dispute that the Plan has not in fact terminated, and the PBGC recognizes that the Plan is an ongoing Plan. The IRS has also issued a favorable letter of determination for the Plan, specifically approving Amendment No. 2 as compliant with the provisions of the Internal Revenue Code applicable to tax-qualified pension plans, which include the anti-cutback rules. (Exh. 3).

Furthermore, because pension plans confer tax advantages on both employees and employers, the Code, IRS regulations, and other IRS pronouncements provide that a plan that has not terminated is generally prohibited from making distributions to active employees and may do so only in very limited circumstances not asserted by or applicable to Plaintiffs. These limitations exist to prevent abuse of the tax benefits derived from pension plans and must be strictly adhered to in order to preserve those tax benefits for the sponsor and for employees. Plaintiffs' Count I disregards these rules by requesting distributions from an ongoing pension plan for working participants. If successful, this would jeopardize the Plan's tax qualification.

### A.    Section 11.6 Is of No Effect Because the Plan Was Not Terminated.

Plaintiffs have not yet retired and continue to work at Finkl. However, Plan Section 11.6, on which Plaintiffs rely, is entitled "Special Provisions in Connection with Termination of Plan Effective February 28, 2007" and provides that "the following special provisions shall apply in

---

[5] Unless otherwise noted, the exhibits cited herein are attached to the Declaration of Steven D. Denten in Support of Defendants' Motion for Summary Judgment.

4

connection with distribution of benefits in accordance with such termination." (Exh. 1, Bates No. 00541.) By its own terms, Section 11.6 is of no effect because termination of the Plan effective as of February 28, 2007 never occurred, and the "distribution of benefits in accordance with such termination" did not and cannot now occur. In so interpreting Section 11.6, the Plan administrator gave the section its plain meaning. This common-sense reading was neither "arbitrary" nor "capricious" and must be upheld. *See, e.g., Krolnik*, 570 F.3d at 843.

Section 11.6 cannot reasonably be interpreted to confer upon active employees a broad right receive distributions of their retirement benefits if the Plan did not actually terminate. Such a provision would be disastrous for participants because it would jeopardize the tax-qualified status of the Plan by violating the Code. *See, e.g.,* 26 C.F.R. § 1.401-1(b)(1)(i); 26 C.F.R. § 1.401(a)-1(b); IRS Notice 2007-69 (2007); Treas. Dec. Int. Rev. 9325 (2007); Rev. Rul. 74-254, 1974-1 C.B. 91 (1974). Because the Plan has not yet terminated, the terms of the Plan, which reflect the Code's limitations on distributions to working employees, restrict Plaintiffs' ability to receive a distribution at this time. (Exh. 1, Bates No. 00486.) The Plan administrator's decision was correct and is fully dispositive of Count I.

### B. With Few Exceptions, the Internal Revenue Code Prohibits Pension Distributions to Active Employees.

Although they have not retired or terminated employment, Plaintiffs argue that they are entitled to receive early retirement benefits, based on their having attained 30 years of service. (Complaint, ¶¶ 7-9, Prayer to Count I.) The Plan does not provide for such benefits, which are prohibited under applicable tax law:

> "[A]n early retirement benefit, including an unreduced early retirement benefit, is permitted to be conditioned on completion of a stated number of years of service *(such as 30 years of service)*. However, an early retirement benefit is generally only permitted to commence with an annuity starting date that is *after severance*

> *from employment* (except to the extent permitted under § 401(a)(36), as added by the Pension Protection Act of 2006, Pub. L. 109-280)."

IRS Notice 2007-69 (2007) (emphasis added).

The Code is concerned with ensuring that tax-advantaged pension plans are used primarily to provide retirement benefits. Accordingly, an ongoing defined benefit pension plan "is generally not permitted to pay benefits before retirement" to active employees who have not retired or otherwise separated from employment. Treas. Dec. Int. Rev. 9325 (2007); *see also* 26 C.F.R. § 1.401(a)-1(b). The exceptions to this general rule are narrowly drawn, do not apply to Plaintiffs or to this litigation, and have not been asserted by Plaintiffs.

The IRS has long held that a plan does not meet the tax qualification requirements for a pension plan "if it permits distributions prior to normal retirement and prior to termination of employment or termination of the plan." Rev. Rul. 74-254, 1974-1 C.B. 91 (1974). Pension plans are neither intended nor permitted to make distributions to participants who continue to be employed and have not yet reached normal retirement age, unless the Plan itself is terminating. At the time of Plaintiffs' benefit claims, no Plaintiff had terminated employment or reached normal retirement age, and the Finkl Plan had not terminated. Therefore, the Plan was prohibited from making the distributions requested by Plaintiffs.

"In order for a pension plan to [meet the tax qualification requirements of the Code], the plan must be established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to its employees over a period of years, usually for life, *after retirement* or *attainment of normal retirement age.*" 26 C.F.R. § 1.401(a)-1(b)(1)

(emphasis added); *see also* 26 C.F.R. § 1.401(a)-1(b)(2) (defining minimum requirements for pension plan "normal retirement age").[6]

Applicable regulations further provide that a "qualified pension plan…provide[s] for the livelihood of the employees or their beneficiaries *after the retirement* of such employees" and "is a plan established and maintained by an employer" to pay benefits "*after retirement*."  26 C.F.R. § 1.401-1(b)(1)(i) (emphasis added).  "However, a plan is not a pension plan if it provides for the payment of benefits not customarily included in a pension plan."  *Id*.  Pension plans do not "customarily" distribute lump sums or annuity payments to active employees.

As required by the Code, the Plan's written terms incorporate these restrictions on benefit distributions.  *See* Plan Sections 2.1 & 2.2 (Exh. 1, Bates No. 00486.)  Because the Plaintiffs all continued in Finkl's employ at the time of their benefit claims, none of them had yet met the conditions for distribution of pension benefits imposed by the law and the Plan, and therefore the Plan administrator was required to deny their benefit claims.  When Plaintiffs retire, they will be entitled to receive pension benefits in accordance with the applicable law and Plan terms.

## C.    The Decision to Terminate an ERISA Pension Plan Is Entirely Within the Sponsor's Authority.

"ERISA provides an employer with broad authority to amend a plan."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999).  The U.S. Supreme Court recently confirmed that "[i]t is well established in this Court's cases that an employer's decision *whether* to terminate an

---

[6] The "normal retirement age" under the Finkl Plan is 65.  *See* Plan Section 1.20 (Exh. 1, Bates No. 00485).  None of the Plaintiffs had attained age 65 at the time they demanded distributions  Furthermore, although the tax code permits (but does not require) distributions to active employees who have attained normal retirement age but not yet retired, the Plan does not so permit.  *See, e.g.,* Rev. Rul. 74-254, 1974-1 C.B. 91 (1974). (Exh. 1, Bates No. 00486.)  Therefore, even if the Plaintiffs had reached age 65, they would not have been entitled to receive their pension benefits, other that certain minimum required distributions described in 26 U.S.C. § 401(a)(9) and Article XIV of the Plan,  until they actually left Finkl's employment or the Plan terminated.

ERISA plan is a settlor function" within the broad discretionary authority of the plan sponsor. *See Beck v. PACE Int'l Union*, 551 U.S. 96, 101 (2007) (emphasis in original).

Whether to establish, continue, merge, or terminate an ERISA pension plan is a "pure business decision." *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995); *see also Beck*, 551 U.S. at 101. "An employer may thus unilaterally terminate a plan governed by ERISA without violating the Act." *Akers*, 71 F.3d at 231. The employer retains complete autonomy to decide whether to create, continue, or terminate a pension plan under ERISA and the Code.

### D. Participants Have No Right to Sue to Compel a Plan Termination.

In the *Hughes Aircraft* litigation, plaintiffs argued that a particular plan amendment entitled them to a court order compelling the plan sponsor to terminate the plan. *See Hughes Aircraft*, 525 U.S. at 446. The Supreme Court disagreed, stating that plaintiffs' claim was "inconsistent with the language of ERISA's termination provisions," which provide the "exclusive" method of plan termination, and that ERISA "should not be supplemented by extratextual remedies." *Id.*

Pension plan termination is governed by statute. *See id.*; 29 U.S.C. §§ 1341-1371. ERISA refers to the termination procedures outlined in 29 U.S.C. § 1341 as the "exclusive means of plan termination." 29 U.S.C. § 1341(a)(1). Nothing in ERISA's civil enforcement provision (29 U.S.C. § 1132), the Code, or applicable regulations grants participants a private right of action to force an employer to begin or complete the plan termination process. Other than the plan sponsor, only the PBGC can initiate termination of a pension plan, and only then if the plan's financial circumstances have become so dire that it meets the statutory conditions. *See* 29 U.S.C. § 1342. ERISA does not confer upon a few individual participants, such as the Plaintiffs, the right to compel termination of the employer's pension plan with respect to *all* participants.

8

ERISA is a "comprehensive and reticulated statute" with "carefully integrated civil enforcement provisions" that should not be amended by inferring that a participant can force a plan to terminate or execute a proposed termination. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985); *see also Hughes Aircraft*, 525 U.S. at 447. In light of the absence of any provision of ERISA authorizing the relief Plaintiffs seek, it is unsurprising that Defendants have been unable to identify any instance in which a plaintiff, other than the PBGC acting pursuant to its statutory responsibilities, has successfully sued to compel a pension plan to terminate and distribute its assets.

**E.** **No Law Requires that the Termination Process Must Be Completed Once It Has Begun.**

A plan sponsor may become unable or unwilling to complete an intended termination of its pension plan for any number of reasons. The law does not provide that a plan sponsor must complete a plan termination after the plan has been amended to provide for the termination, after participants have been advised of the termination, or after the termination process has progressed to a certain point. Such a rule would be irreconcilable with the termination statute and regulations, which provide that a termination does not occur unless each step of a very specific statutory procedure is followed, including obtaining PBGC approval for the termination. *See, e.g.,* 29 U.S.C. § 1341; 29 C.F.R. §§ 4041.23(b)(2), Rev. Rul. 89-87, 1989-2 CB 81 (1989); Internal Revenue Manual § 7.12.1.2.3(4)-(5). These steps were not completed for the Finkl Plan, which remains an ongoing plan.

Federal regulations allow that the plan sponsor may choose not to carry out the process, by requiring that participants be advised "if the termination does not occur" or "if the plan is not going to terminate." 29 C.F.R. §§ 4041.23(b)(2) & 4041.31(g). Thus, the notice of intent to

terminate issued for the Plan appropriately informed participants, "If the proposed termination does not occur, we will notify you in writing." (Exh. 1, Bates No. 0001.)

ERISA's pension plan termination statute is the "[e]xclusive means of plan termination." 29 U.S.C. § 1341(a). One of the last stages of the pension plan termination process is prompt and full distribution of all plan assets. *See* 29 U.S.C. § 1341(b)(1)(D); Rev. Rul. 89-87, 1989-2 C.B. 81 (1989). The plan is not considered terminated if this distribution does not conclude within 180 days of the expiration of the PBGC's review period or, if later, within 120 days of receipt of a favorable determination letter from the IRS, unless the plan requests and receives an extension of these deadlines from the PBGC. *See* 29 C.F.R. § 4041.28(a)(1).

Numerous sources recognize that, if for any reason plan assets are not fully distributed, the plan remains an ongoing plan. *See, e.g., id.*; 29 U.S.C. § 1341(b)(1)(D); 26 C.F.R. § 1.416-1, T-4; Rev. Rul. 89-87, 1989-2 C.B. 81 (1989); Internal Revenue Manual § 7.12.1.2.3(4)-(5) ("[B]ecause assets have not been distributed and are not in the process of prompt liquidation, the plan is not considered terminated for [tax] qualification purposes"); 2008 Instructions to IRS Annual Return/ Report of Employee Benefit Plan (Form 5500), pp. 54-55 ("However, if termination fails to occur — whether because assets remain in the plan's related trust…or for any other reason…there is no termination date").

The IRS has long held that a "pension [plan]…is not terminated if, after an amendment is adopted to terminate the plan, the plan assets are not distributed as soon as administratively feasible." Rev. Rul. 89-87, 1989-2 CB 81 (1989). Likewise, applicable regulations define a "terminated plan" as "one that has been formally terminated, has ceased crediting service for benefit accruals and vesting, and has been or is distributing all plan assets to participants or their beneficiaries as soon as administratively feasible." *See* 26 C.F.R. § 1.416-1, T-4.

As described above, a pension plan that has not terminated continues to be subject to the requirement that it not pay pension benefits to persons who have not retired and not reached normal retirement age. *See, e.g.,* Internal Revenue Manual § 7.12.1.2.3(4)-(5) (acknowledging that if the plan begins but does not complete the termination process, the plan qualification requirements of the Code continue to apply).

**1.      The consequence of an incomplete pension plan termination is that the plan remains an ongoing plan.**

ERISA does not penalize a sponsor for voluntarily withdrawing a proposed plan termination. Rather, the explicit consequence of the failure to complete the plan termination process is that the plan continues to be treated as ongoing rather than terminated. *See, e.g.,* 29 U.S.C. § 1341. As discussed above, the law does not provide a right of action for participants of a plan that begins but does not complete the termination process, nor would any right of action be appropriate given that the termination decision is wholly within the plan sponsor's purview. *See, e.g., Beck*, 551 U.S. at 101.

**2.      Employers must have flexibility to withdraw from the plan termination process.**

There are many practical reasons why an employer might decide not to conclude a plan termination after beginning the process. For example, an employer may be planning to terminate the plan as part of a sale or merger of the company itself. If the transaction falls through, the reason for the termination also disappears.

In addition, standard termination of a pension plan requires that the plan have sufficient assets to purchase annuity contracts that will satisfy the plan's benefit liabilities to participants. *See* 29 U.S.C. §§ 1341(b)(1)(D) & (b)(3)(A). Full funding of a plan termination normally requires more cash than full funding on an ongoing basis, because the plan must have sufficient

assets to purchase annuities from a third party provider. Even if an employer wishes to voluntarily terminate its pension plan and takes initial steps towards termination by amending the plan or notifying participants, the termination process cannot be completed unless plan assets are sufficient to purchase the necessary annuities. *See id.* A variety of factors may affect the employer's desire or ability to complete the termination by purchasing annuities, including increases in the price of annuities, poor investment performance of plan assets, or the employer's changing business conditions. The employer is and must be free to consider any or all of these circumstances as the termination process progresses.

A pension plan sponsor can never be certain of the cost of plan termination until benefits are actually distributed through the purchase of annuities from third party insurers. The purchase of annuities to satisfy benefit liabilities is one of the final steps in the lengthy termination process, and annuity prices change daily with market conditions.[7] Because the annuity purchase phase may begin a year or more after the initial decision to terminate the plan is made, the sponsor must have flexibility to withdraw from the termination process. Changing circumstances may lead an employer who has begun the standard termination process to later determine that it must abandon those efforts because plan assets are no longer sufficient to complete the termination, or because the employer is no longer in a position to contribute additional money to the plan to facilitate the termination. The law described above, as it must, plainly allows employers to withdraw from the termination process prior to distribution.

> **3.      The PBGC confirmed that Finkl was entitled to withdraw from the termination process.**

Finkl notified the PBGC of its withdrawal from the pension plan termination process.

---

[7] Annuity prices have an inverse relationship with interest rates. Generally, when interest rates are low, annuity prices are high.

The PBGC confirmed in writing that "[the PBGC has] withdrawn the termination," instructed

Finkl to notify participants that "the Plan did not (or will not) terminate," and confirmed that the

"Plan is an on-going Plan." (Exh. 1, Bates No. 00347.)

Other PBGC materials also acknowledge that an announced plan termination may be

withdrawn, even after participants have been notified of the termination and the standard

termination notice has been filed with the PBGC. Regulations issued by the PBGC state that if,

after notice of the plan termination has been given to the PBGC and participants, the plan

sponsor determines that "the plan is not going to terminate," participants must be notified. 29

C.F.R. § 4041.31(g). Likewise, the PBGC's website contains the following:

> "Q: What happens if the plan administrator *decides* not to terminate the plan after
> a filing has been made with PBGC?
>
> A: The plan administrator should notify PBGC of a decision not to proceed with a
> termination after having filed a Form 500 (Standard Termination Notice) with the
> agency. PBGC will contact the plan administrator for information if the agency
> fails to receive all required filings. Correspondence should be addressed to PBGC,
> Technical Assistance Branch, Suite 930, 1200 K Street NW, Washington, DC
> 20005-4026.
>
> In the Notice of Intent to Terminate that is provided to affected parties, the plan
> administrator must inform them that they will be notified if the termination is
> canceled. The plan administrator therefore should notify affected parties promptly
> after deciding not to terminate the plan. Thereafter, if a decision is made to again
> proceed with the termination, the process must begin with a new date of plan
> termination and Notice of Intent to Terminate."

PBGC Website, available at http://www.pbgc.gov/practitioners/plan-terminations/

content/page13260.html (emphasis added).

PBGC regulations further provide that a pension plan termination is not "valid" unless

"[t]he plan administrator files a post-distribution certification under § 4041.29 and the PBGC

does not issue a notice of noncompliance pursuant to § 4041.31(b)." 29 C.F.R. § 4041.31(f); *see*

*also* 29 C.F.R. § 4041.29. For the Finkl Plan, the final asset distribution did not occur, and the

Plan did not (and could not) file the requisite "post-distribution certification" with the PBGC. Thus, the termination was not completed.

### 4. The IRS likewise acknowledges that the termination process may not be completed and has approved Finkl's repeal of Amendment No. 1.

Like the PBGC, the IRS recognizes that a planned pension plan termination will not always be achieved and approved Finkl's repeal of Amendment No. 1 in its determination letter. (Exh. 3.) *See also, e.g.*, Rev. Rul. 89-87, 1989-2 C.B. 81 (1989); Internal Revenue Manual 7.12.1.2.3(4)-(5) (noting that plan termination for purposes of the Code does not occur unless the assets are distributed as soon as administratively feasible after the proposed termination date). The Internal Revenue Manual states, "If actions are taken to terminate a plan but the assets are not distributed as soon as administratively feasible…the plan's qualified status must have been maintained until the plan is terminated in fact." Internal Revenue Manual 7.12.1.2.3(4)-(5). Among the myriad of qualification requirements that continue to apply until the plan makes its final distribution to participants is the general prohibition on distributions to active employees.

### F. The Plan Gave Finkl the Right to Amend the Plan By Repealing Section 11.6.

To implement its decision not to terminate the Plan, Finkl amended the Plan by repealing Section 11.6. "It is well settled that companies are free to amend their pension plans." *Page v. Bancroft Neurohealth, Inc.*, 575 F. Supp. 2d 664, 675 (E.D. Pa. 2008); *see also Hughes Aircraft*, 525 U.S. at 442; 29 U.S.C. § 1102. Section 11.1 of the Plan states that "[t]he Employer expressly reserves the right….to amend, alter, [or] modify…any and all provisions of the Plan." (Exh. 1, Bates No. 00520.) Finkl's expansive right to amend the Plan's terms is limited only by the anti-cutback requirements imposed by ERISA and the Code, which are incorporated by Plan Section 11.1. The Finkl Plan therefore gave Finkl the right to modify the Plan's terms, including the right to repeal Section 11.6.

### G.    The Anti-Cutback Rules Did Not Apply to Plan Section 11.6.

ERISA and the Code contain parallel "anti-cutback rules," which are limited exceptions to the general rule that plan sponsors are free to amend their plans in any manner.  *See* 26 U.S.C. § 411(d)(6); 29 U.S.C. § 1054(g).  The anti-cutback rules prevent a plan sponsor from amending a pension plan to reduce or eliminate certain accrued benefits that are specified in 26 U.S.C. § 411(d)(6); 26 C.F.R. § 1.411(d)-3 & -4.

The Code and applicable regulations painstakingly define the benefits that are protected by the anti-cutback rules and do "not provide protection for benefits that are ancillary benefits, other rights and features, or *any other benefits that are not described in section 411(d)(6)*."  26 C.F.R. § 1.411(d)-3(b)(3)(i) (emphasis added).  Hence, the anti-cutback rules of Code Section 411(d)(6) must be strictly construed and should not be distorted.

Plaintiffs seek to use the anti-cutback rules to obtain the "benefit" of receiving a pension distribution while remaining an active employee.  This type of distribution is not within the limited list of protected "accrued benefits" described by the anti-cutback statute and regulations.  In fact, as demonstrated by the ample authority described above, such a benefit is not even permissible due to the restrictions applicable to distributions to active employees.

Plaintiffs argue that Amendment No. 1 "unconditionally abolished" the Plan's requirement that participants must terminate their Finkl employment before receiving retirement benefits.  (Complaint, ¶ 27.)  "Unconditional abolition" of the requirement of termination of employment would be impossible under the Code, and Amendment No. 1 did no such thing.  Amendment No. 1 stated that participants could receive final distributions when the Plan made a final distribution of its assets in connection with a particular event, namely the plan termination effective February 28, 2007.  The planned termination did not take place, and so the Plan is now

prohibited from making final distributions to employees as originally contemplated. The precondition applicable to the termination distribution described by Amendment No. 1, which was required only by the amendment itself but also by the Code, was not fulfilled. Amendment No. 1 did not create a broad new "optional form of benefit" protected by the Code's anti-cutback rules as Plaintiffs' claim. That benefit would violate the Code, not conform to it. As noted above, the IRS explicitly approved the repeal of Amendment No. 1 and did not determine that a cutback had occurred. (Exh. 3.)

The anti-cutback rules do not change the reality that, if for any reason an expected plan termination does not occur, active employees generally cannot receive an early distribution of their retirement benefits. Plaintiffs' proposed interpretation of the anti-cutback rules would require that, if a pension plan has been amended to provide for distribution of assets as part of an anticipated plan termination, the anti-cutback rules are violated if the plan assets are not fully distributed because the plan does not actually terminate. This interpretation is contrary to the plan termination statute and regulations because it mistakenly assumes that a plan amendment is legally sufficient to entitle active employees to a current distribution, which is clearly not the case. "Termination…can be effected only in circumstances strictly defined by ERISA, and its consequences are prescribed in detail by the statute." *LTV Steel Co. v. United States*, 215 F.3d 1275, 1279 (Fed. Cir. 2000). The termination statute and regulations, as well as the federal agencies responsible for oversight of the termination process, each fully recognize that whether a plan will complete the termination process is far from certain, that a plan sponsor may lawfully decide not to complete a plan termination, and that a mere plan amendment does not ensure that a plan termination distribution to active participants can lawfully occur unless the remaining conditions of ERISA are fulfilled.

### III.     Defendants Are Entitled to Summary Judgment as to Count II.

Defendants have processed all claims submitted by Plaintiffs in accordance with Section 10.1 of the summary plan description.  Therefore, Count II must be dismissed.

#### A.     The Plan Administrator Timely Processed the Claims It Received.

In their Second Amended Complaint, Plaintiffs state that they had received no response to their November 24, 2008 letter when the First Amended Complaint was filed on December 15, 2008.  (Complaint, ¶ 29.)  Plaintiffs fail to acknowledge that the Plan administrator's written denial of the claims on December 22, 2008, less than one month after Plaintiffs' request but more than seven months before the date of the Second Amended Complaint was filed.  (SOUF, ¶¶ 24-31.)  Plaintiffs also fail to acknowledge the June 2008 correspondence between Plaintiffs' counsel and Finkl's counsel, in which Finkl's counsel informed Plaintiffs' counsel that the May 19, 2008 benefit forms were moot in light of the withdrawn termination, to which conclusion Plaintiffs' counsel did not object.  (SOUF, ¶¶ 27-29.)

Plaintiffs appealed the denial in writing by letter of January 27, 2009.  (Exh. 1, Bates No. 00424-426.)  The Plan administrator considered the issues Plaintiffs raised in the appeal letter and timely denied the appeal on March 26, 2009.  (Exh. 1, Bates No. 00428-469; Exhibits to Final Denial Letters at Bates No. 00470-1241.)  These actions fully complied with Section 10.1 of the summary plan description.  (Exh. 1, Bates No. 00568-00570.)  Plaintiffs have now exhausted their administrative remedies with respect to Count I and the special bonus issue raised in paragraph 33(a) of Count III.

#### B.     Miles and McFawn Did Not Seek Review by the Pension Committee of the Claims They Now Raise in Count III.

As further discussed below under Count III, Miles and McFawn never engaged the Plan's claims procedure with respect to the issues they now assert in paragraphs 33(b) and (c).  In their

letter of November 24, 2008, Plaintiffs did not raise the purported miscalculation of the benefits

of Miles and McFawn. The Plan administrator's December 22, 2008 response addressed only

the withdrawn plan termination and the special bonus issues but informed each Plaintiff that they

could appeal the determination and submit any additional comments or documents, including

information indicating "that their benefit amounts claimed were not based on special bonuses."

(Exh. 1, Bates No. 00411.) Despite this invitation to clarify or submit additional grounds,

Plaintiffs' appeal letter of January 27, 2009 contained no additional grounds and no objection to

the Plan administrator's omission from its determination of the issues now raised by Miles and

McFawn in Count III.

Because Miles and McFawn have not yet utilized the summary plan description's

administrative procedures for their claims by making a written claim to the Pension Committee,

it follows that the Plan administrator has not failed to comply with those procedures. Miles and

McFawn are free to submit their claims at any time, but Count II must be dismissed with respect

to these claims.

## IV. Defendants Are Entitled to Summary Judgment as to the "Special Bonus" Claim of Count III.

Paragraph 33(a) alleges that the Plan administrator erred by excluding "special bonuses"

from Plaintiffs' pension calculations. Section 1.6 of the Plan document states that "bonuses

received by a Participant in Plan Years beginning after December 31, 1990, and which are

identified by the Employer as 'special bonuses,' shall not be included in Compensation." (Exh.

1, Bates No. 00478.) Because "special bonuses" are not "Compensation" under the Plan, the

Plan administrator is required to exclude special bonuses from pension calculations. Notably,

the summary plan description likewise states that "bonuses received in Plan Years beginning

after December 31, 1990, and which are identified by the Employer as 'special bonuses,' are not included" for the purpose of the pension "benefit formula."  (Exh. 1, Bates No. 00556.)

Finkl first introduced the concept of special bonuses in 1991.  Before that time, the Company regularly paid bonuses but the Plan provided that employees would not receive pension credit for any amount paid as a bonus.  Effective with the 1991 plan year, the Plan was amended to state that only "special" bonuses would be excluded from pension credit.  (SOUF, ¶ 10.)  This amendment, combined with the new system of classifying bonuses as special or regular, benefited participants by allowing them to receive credit for a portion of their total bonus payment.  (SOUF, ¶ 11.)

In the appeal letter submitted to the Plan administrator on January 27, 2009, Plaintiffs alleged that Defendants classified bonuses as special or regular on an "*ex post facto*" basis. (Exh. 1, Bates No. 00426.)  However, the Company's historical records, created contemporaneously with the determination and payment of special and regular bonuses, unambiguously show that bonuses were classified by the Company as either special or regular at the time they were awarded, not at some later date.  (SOUF, ¶ 12; Exh. 1, Bates No. 00432.)

Persons who received both special and regular bonuses received two separate bonus checks.  (SOUF, ¶ 13; Exh. 1, Bates No. 00432.)  When Finkl first began issuing special bonuses in 1991, the special bonus check stub contained a written notation indicating that the check was for a "special bonus," but the Company eventually discontinued this practice. (SOUF, ¶ 13; Exh. 1, 00432.)  Supervisors who distributed the two bonus checks were expected to explain to employees which checks were for special and regular bonuses.  But even if an employee did not receive this explanation, that would not change the fact that the Company's records show that the disputed amounts were in fact contemporaneously "identified by the Employer" as "special

19

bonuses," as required by Plan Section 1.6. Plaintiffs' attempt to rope special bonuses into the pension formula has no basis in either the Plan document or the Company's historical operation. The Plan administrator properly denied this claim.

## V.    Defendants Are Entitled to Summary Judgment on the Miles QDRO Claim.

Miles's claim that his QDRO has been incorrectly administered must be dismissed. The claim is now moot. In addition, Miles has failed to exhaust the administrative claims procedure before bringing suit, as required by ERISA. Finally, Miles's claim cannot proceed in the absence of his wife, who is a necessary party.

### A.    Miles's QDRO Claim, as Described in Plaintiffs' Response to Defendants' Motion to Dismissed, Is Moot.

As Defendants argued in support of their motion to dismiss, the claim raised by Paul Miles ("Miles") in paragraph 33(b) of the Complaint is devoid of both factual and legal allegations sufficient to plead a claim under Fed. R. Civ. P. 8. Paragraph 33(b) states only that the Company "incorrectly appl[ied] rules applicable to [Miles's] Qualified Domestic Relations Order."

Despite this pleading deficiency, Plaintiffs' responsive pleading to Defendants' motion to dismiss suggests that Miles's claim is that a handwritten note on his pension benefit election package divides his benefit equally between Miles and his former spouse, whereas his spouse is entitled to only that portion of the benefit that accrued through August 28, 2006. (Docket No. 42.) Upon review of this responsive pleading, the Plan administrator has reexamined the QDRO and determined that it agrees with Miles as to this issue. (SOUF, ¶ 17.) This decision moots the claim, as it is described in Plaintiffs' responsive pleading to Defendants' motion to dismiss. Significantly, Miles has not been harmed by the handwritten note on Miles's benefit election

package, because Miles has not yet retired and begun receiving his pension. Likewise, his

former wife has not yet elected to begin receiving her share of the pension.

**B.      Miles Never Presented His QDRO Claim to the Plan Administrator.**

As stated in support of Defendants' motion to dismiss, "[a]n ERISA plaintiff must

exhaust all available administrative remedies before filing suit to challenge a denial of benefits."

*Ruttenberg*, *v. United States Life Ins. Co.*, 413 F.3d 652, 662 (7th Cir. 2005). To date, Miles has

never filed an administrative claim with the Pension Committee with respect to his QDRO. The

claim and election forms submitted by Miles on May 19, 2008 contain no reference to the

QDRO. (Exh 1, Bates No. 00290-00302.) After the plan termination was withdrawn, Miles's

counsel wrote to the Company's outside counsel, Larry Goldstein, but again neglected to

mention Miles's QDRO claim. (Exh. 1, Bates No.00349-00352.) Goldstein promptly responded

that the May 19, 2008 forms were moot. (Exh. 1, Bates No. 00353-00358.)

Six months after submitting the May 19, 2008 forms, Miles's counsel wrote to the Plan

administrator on November 24, 2008 and requested that the Plan administrator make a formal

determination of the May 19, 2008 claims. (Exh. 1, Bates No. 00409.) Again, the

correspondence failed to note Miles's QDRO claim. The Plan administrator made a formal

determination on December 22, 2008, denying the May 19, 2008 claims. (Exh. 1, Bates No.

00410-00412.) Because the Plan administrator could not know whether the increased pension

amounts shown on Plaintiffs' altered benefit election forms masked other claims of which the

Plan administrator was not aware, the December 22, 2008 denial letter informed Plaintiffs that

they could appeal the determination and that they were free to "submit written comments,

documents, records, and other information relating to their claim for benefits, including

information, *that their benefit amounts claims were not based on special bonuses*." (Exh. 1,

Bates No. 00411, emphasis added).  Miles's counsel appealed the denial by letter of January 27, 2009, but again, the appeal letter was silent as to Miles's QDRO.  (Exh 1, 00424-00426.)  Miles did not use this opportunity to clarify that his May 19, 2008 claim was based in part on his QDRO.

By letter of March 26, 2009, the Plan administrator made a final determination of the May 19, 2008 claims.  (Exh. 1, Bates No. 00446-00451.)  Although not required to do so, the Plan administrator's March 26, 2009 denial letter permitted Plaintiffs "to make additional submissions to the Committee after reviewing this letter and the information provided to [Miles's counsel]" within 45 days.  (Exh. 1, Bates No. 00433.)  No additional information regarding the QDRO or any other subject was submitted.

In their response to Defendants' motion to dismiss, Plaintiffs argued that the numbers Miles altered on his May 19, 2008 submissions constituted administrative claims with respect to his QDRO.  (Docket No. 42.)  This contention falls flat.  Even if the May 19, 2008 claim form could be interpreted to encompass the QDRO claim, Miles would nevertheless have failed to satisfy ERISA's exhaustion requirement because the Plan administrator denied the May 19, 2008 claim forms on December 22, 2008, and Miles failed to appeal this denial with respect to the QDRO.  Furthermore, it would now be impossible for Miles to ever satisfy ERISA's exhaustion requirement because the Plan requires that appeals be filed in writing within 60 days.  (Exh. 1, Bates No. 00411, 00569.)  Miles's failure to engage the administrative process before bringing suit has caused the parties and the Court to unnecessarily expend substantial resources disposing of this claim.

### C.    The Court Cannot Adjudicate the Claim Without Esther Miles.

This claim must be dismissed due to Plaintiffs' failure to join the alternate payee named

in the qualified domestic relations order, Esther Miles, as a defendant in this action. Plaintiffs were required to join Esther Miles under Fed. R. Civ. P. 19, which states requires joinder of necessary parties.

A QDRO is the mechanism under ERISA for dividing a single pension benefit between the participant and an alternate payee, who is typically the participant's former spouse. Miles's claim, as he has described it in Plaintiffs' response to the motion to dismiss, is that he is entitled to a larger share of his pension than that which is indicated by the handwritten note on his benefit election package, and that his former wife is entitled to a smaller share. (Docket No. 42.)

If this claim were litigated in Esther's absence, the Plan would be left at "substantial risk of incurring double, multiple, or otherwise inconsistent obligations" if Miles were to succeed and Esther were to later successfully argue that a different allocation of Miles's pension benefit is appropriate. Fed. R. Civ. P. 19. In addition, determining this matter in Esther's absence would plainly "impede the [her] ability to protect [her] interest" in the benefit. *Id.* Esther Miles is a necessary party within the meaning of Fed. R. Civ. P. 19, and Miles's QDRO claim cannot proceed without her.

## VI.     Defendants Are Entitled to Summary Judgment as to McFawn's Claim.

McFawn has failed to engage or exhaust the Plan's administrative remedies. In addition, he has presented no evidence that his pension has been miscalculated.

### A.     McFawn Has Not Exhausted the Plan's Administrative Remedies.

Like Miles, McFawn never filed a written administrative claim with the Pension Committee with respect to the claims he now asserts in paragraph 33(c) of the Complaint, in accordance with the summary plan description. The claim and election forms submitted by McFawn on May 19, 2008 do not reference these claims, nor are they mentioned in the June 6,

2008 letter from McFawn's counsel to Goldstein, in the November 24, 2008 letter requesting adjudication of the May 19, 2008 claims, or in the January 27, 2009 appeal letter.

As in Miles's case, the Plan administrator's December 22, 2008 denial of the May 18, 2008 claims informed McFawn that he and the other Plaintiffs could appeal the determination and "submit written comments, documents, records, and other information relating to their claim for benefits, including information, *that their benefit amounts claims were not based on special bonuses.*" (Exh. 1, Bates No. 00411, emphasis added). Although the issues now raised by McFawn were not referenced by the December 22, 2008 denial, McFawn did not clarify the Plan administrator's understanding of his claim in his appeal. Similarly, although the Plan administrator's March 26, 2009 final denial letter gave McFawn 45 days to make additional submissions and request further review of his claim, he did not do so.

Again, even if McFawn's May 19, 2008 claims are viewed as including the claims he now asserts in paragraph 33(c) of the Complaint, it would be clear that he has not exhausted the administrative claims procedure because he did not appeal the Plan administrator's determination of those claims. Because the Plan requires that appeals be made in writing within 60 days, it would now be impossible for McFawn to comply with ERISA's exhaustion requirement.

**B. McFawn Has Presented No Evidence That His Pension Is Incorrect.**

To survive summary judgment, the non-moving party "must show that there is evidence creating a genuine issue of material fact." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). The non-moving party "cannot rest on bare pleadings alone." *Clifford v. Patterson Cos.*, 2009 U.S. Dist. LEXIS 107635 (N.D. Ill. 2009). The Plan administrator is not aware of any error, and McFawn has presented no evidence of any mistake. His claim must be dismissed.

## CONCLUSION

Defendants respectfully request that the Court grant summary judgment for Defendants on all counts and dismiss the Complaint with prejudice.

Respectfully submitted,

Dated: November 20, 2009      /s/Regina J. Elbert

Sarah A. Zielinski (Ill. Bar No. 6294156)     James P. McElligott, Jr. (Va. Bar. No. 14109)
McGuireWoods LLP                          Regina J. Elbert (Va. Bar No. 71118)
77 West Wacker Drive, Suite 4100        McGuireWoods LLP
Chicago, Illinois 60601                        One James Center
(312) 849-8288 (Telephone)             901 East Cary Street
(312) 698-4598 (Facsimile)               Richmond, Virginia 23219-4030
szielinski@mcguirewoods.com          (804) 775-4329 (Telephone)
                                      (804) 698-2111 (Facsimile)
                                      jmcelligott@mcguirewoods.com
                                      relbert@mcguirewoods.com

*Counsel for Defendants*

### CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2009, the foregoing was electronically filed and served upon the following via the Court's CM/ECF system:

Arthur G. Jaros, Jr.
Law Office of Arthur G. Jaros, Jr.
1200 Harger Road, #830
Oak Brook, IL 60523
(630) 574-0525

Edward N. Tiesenga
Nathaniel J. Reinsma
Tiesenga, Gottlieb & Reinsma LLP
1200 Harger Road, #830
Oak Brook, IL 60523
(630) 574-0525

*Counsel for Plaintiffs*

/s/Regina J. Elbert
Regina J. Elbert (Va. Bar No. 71118)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-4708 (Telephone)
(804) 698-2058 (Facsimile)
relbert@mcguirewoods.com

*Counsel for Defendants*