**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KENNETH A. CARTER, ROBERT J. KUREK, JOHN MCFAWN, PAUL L. MILES, ADOLPH F. RIVAS, CURLEE THOMAS and Q.C. WILLIAMS, Jr.,** )<br><br>**Plaintiffs,** )<br><br>**v.** )<br><br>**PENSION PLAN OF A. FINKL 7 SONS CO. FOR ELIGIBLE OFFICE EMPLOYEES; A. FINKL & SONS CO., a Delaware Corporation; JOSEPH E. CURCI, STEVE DENTEN, and BRUCE LIIMATAINEN,** )<br><br>**Defendants.** ) | **No. 08 C 7169**<br><br>**Judge Rebecca R. Pallmeyer** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are active employees of Defendant A. Finkl & Sons Co. ("Finkl") and participants in that company's Pension Plan For Eligible Office Employees ("the Plan"). In late 2006, the company, as Plan administrator, decided to voluntarily terminate the Plan in accordance with the procedures set forth in the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1341. In January 2008, the company amended the Plan and informed Plaintiffs that they were eligible to receive immediate annuity benefits as a term of the termination, even though Plaintiffs had not yet actually retired from the company's employ. In May 2008, days after receiving Plaintiffs' claim forms, the company changed course, announcing that the Plan would not terminate after all and that Plaintiffs would receive no immediate distribution of their benefits. Instead, the company told Plaintiffs, participants would have to wait to receive benefits until the time of their actual retirements. Plaintiffs charge that this change violated the anti-cutback provisions of the ERISA statute and the Plan itself. Plaintiffs also contend that the company, the Plan, and the individual members of the Plan's Pension Committee violated ERISA by ignoring Plaintiffs' attempts to obtain their benefits and by miscalculating the value of those benefits. Defendants now move for summary judgment on all claims. For the reasons set forth herein, Defendants' motions are

granted. Plaintiffs have moved for summary judgment on Count II of the complaint, which seeks attorneys' fees in connection with the Pension Committee's alleged failure to comply with the Plan's claims procedure. That motion is denied.

**BACKGROUND**

On a motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). When parties file cross motions for summary judgment, the court is required to adopt a "Janus-like perspective," construing the facts and inferences in favor of the party opposing the motion. *See Miller v. Midland Credit Management, Inc.*, 621 F.Supp.2d 621, 626-27 (N.D.Ill. 2009) (quoting *F.T.C. v. Cleverlink Trading Ltd.*, 519 F.Supp.2d 784, 792 (N.D.Ill 2007)). In this case, the material facts are essentially undisputed.

Finkl is a manufacturer and supplier of industrial steel products with its base of operations in Chicago, Illinois. For many years, Finkl has also been the sponsor and administrator of a tax-qualified defined benefits Plan that is intended to provide income for Finkl's retired former employees. (Pl.'s 56.1 Resp. ¶ 1; Declaration of Finkl's Director of Human Resources, Steven Denten, ¶ 3.) Plaintiffs are all active employees of Finkl and participants in the Plan.[1] (Pl.'s 56.1 Resp. ¶ 32; Denten Decl. ¶ 22.) At the time of the events described below, Plaintiffs had each completed more than 30 years of service in Finkl's employ, and were, thus, qualified for the Plan's "30-and-out" early retirement benefit, which entitled each Plaintiff to begin receiving a pension annuity upon the date of actual retirement regardless of whether he had actually reached the Plan's

---

[1] Plaintiff Robert Kurek was an active employee at the time this litigation commenced, but the parties agree that Kurek has since retired from the company and has begun receiving benefits under the Plan in its unamended form. The parties do not address whether Kurek's claims are now moot or whether his receipt of benefits under the Plan render his interests adverse to those of his co-Plaintiffs. For the purposes of this motion, the court assumes that Kurek's claims remain viable and that he maintains an identity of interest with his co-Plaintiffs.

designated retirement age of 65.  (Ex. 1 to Denten Decl., Bates No. 00050-52.)[2]

In late 2006, Finkl elected to begin the process of voluntarily terminating the Plan, in accordance with the procedure prescribed by ERISA, 29 U.S.C. § 1341.  (Pl.'s 56.1 Resp. ¶ 2, Denten Decl. ¶ 4.)[3]  On December 22, 2006, the company provided participants, including Plaintiffs, with a written "Notice of Intent to Terminate the Plan," as required by 29 U.S.C. § 1341(a)(2).  (Pl.'s 56.1 Resp. ¶ 3; Denten Decl., ¶ 4.)  The Notice informed the participants that Finkl "intend[ed] to terminate the Plan in a standard termination in accordance with [ERISA]."  (Ex. 1 to Denten Decl., Bates No. 00001-02.)  The Notice further identified the "proposed termination date" as February 28, 2007, and stated: "In order for the Plan to terminate, Plan assets must be sufficient to provide all Plan benefits.  If the proposed termination does not occur, the Company will notify you in writing." (*Id.*)[4]

In August 2007, the company notified the Pension Benefit Guaranty Corporation ("PBGC") and the Internal Revenue Service ("IRS") that it intended to terminate the Plan.  The PBGC responded by letter, dated October 22, 2007, confirming that the agency had received Finkl's notice

---

[2]     Wherever possible, the court has cited to the administrative record developed in response to Plaintiffs' claims before the Plan's Pension Committee, which is comprised of a number of Finkl's representatives.  For this, the court has adopted the parties' preferred citation reference: "Bates No. ___."

[3]     Though the parties have not directly addressed the matter, the court infers that Finkl expected to eliminate its Pension Plan and replace it with a restructured 401(k) personal savings plan.  (Ex. 1 to Denten Decl., Bates No. 00345-0034.)  Finkl has not explained why the attempted termination of the Pension Plan took more than one year, but the Plan termination may have been a part of other strategic decisions; there are hints in the record that Finkl was contemplating a merger with another company and a large-scale relocation of its operations during this same time period.  Denten asserts that Finkl anticipated that it would be required to come up with a substantial contribution in order to supplement the pension fund's abilities to satisfy its obligations.  (See *id.*)

[4]     Had it happened, the Plan termination would have been retroactive: The Plan's "proposed termination date" of February 28, 2007 had actually passed by the time Finkl began the termination process in earnest.  ERISA allows a Plan administrator to amend a plan both prospectively and retroactively, so long as the amendment does not deprive a participant of a promised benefit.  *See e.g. Dyce v. Salaried Employees' Pension Plan of Allied Corporation*, 15 F.3d 163, 166 (11th Cir. 1994).  Accruals of employee benefits under the Finkl Plan were "frozen" from December 31, 2006 until at least May 2008, when the company ultimately aborted the process and the Plan resumed its normal operation. (Ex. 1 to Denten Decl., Bates No. 00346)

and stating: "If PBGC does not issue a Notice of Noncompliance within the 60-day period after the PBGC receipt date [August 27, 2007], you must begin distributing plan assets to close out the plan." (Ex. 1 to Denten Decl., Bates No. 00387.) The letter also directed that Finkl complete the "distribution of plan assets to close out the plan within 180 days after the expiration of the PBGC's 60-day review period," unless the agency granted a deadline extension. (*Id.*) (emphasis in original). Thus, absent a Notice of Noncompliance from the PBGC, Finkl was expected to begin the distribution of assets on October 26, 2007. In fact, however, as explained below, Finkl never actually initiated any distribution, and the PBGC found no violation of the company's ERISA obligations.

On January 28, 2008, Finkl formally amended the Plan, retroactively adopting the proposed termination date. The amendment, hereafter referred to as Amendment 1, contains the following language:

> The Plan shall terminate effective February 28, 2007 and the following special provisions shall apply in connection with distribution of benefits in accordance with such termination . . . . If a Participant has not begun to receive a benefit under the Plan at the time benefits are to be distributed on account of termination of the Plan, he may elect to receive his benefit . . . under the Plan in the form of an immediate annuity or a deferred annuity . . . regardless of whether he remains employed by the Employer. . ."[5]

(Ex. 1 to Denten Decl., Bates No. 00541-00542.) On February 21, 2008, Finkl's counsel sent a letter on behalf of the company to the PBGC, seeking to extend the final deadline for distributing the Plan's assets, then set for April 23, 2008. (Ex. 1 to Denten Decl., Bates No. 00391-00393.) The letter acknowledged that the agency's 60-day review period had expired on October 26, 2007 without issuance of a Notice of Noncompliance, but explained that the company required more time to achieve the distribution of Plan assets because it had "taken considerably longer than anticipated to complete benefit election forms with final calculations" for the Plan's participants. The PBGC

---

[5]     The amendment also provided for other benefit election options. The court omits the provisions addressing these alternatives as irrelevant, because every Plaintiff elected to receive the described immediate annuity.

4

granted the extension by letter dated February 27, 2008 and announced that the Plan would have until June 9, 2008 to fully distribute its assets. (Ex. 1 to Denten Decl., Bates No. 00394.) Finkl subsequently sought and received an additional extension, pushing the deadline for final distribution back to August 11, 2008. (Ex. 1 to Denten Decl., Bates No. 00404.)

In the spring of 2008, the Plan provided Plaintiffs and other participants with a statement of benefits and an "election form," which permitted participants to check a box expressing their desire to receive an immediate distribution of benefits. (Pl.'s 56.1 Resp. ¶ 24, Ex.1 to Denten Decl., Bates No. 00254-00341.) The letter accompanying the form stated: "The termination of the Pension Plan of A. Finkl & Sons Co. for Eligible Office Employees has been approved by the Pension Benefit Guaranty Corporation. It is time to pay benefits to the participants." (Ex. J to Def. 56.1 Stat.) On May 19, 2008, each of the Plaintiffs returned forms denoting that they had elected to receive immediate life annuities. (Pl.'s 56.1 Resp. ¶ 24, Ex.1 to Denten Decl., Bates No. 00254-00341.) The Plaintiffs had also altered the forms by marking out some of the estimated benefit values and inserting benefit calculations of their own. (*Id.*) Each Plaintiff had also appended a letter, which carried the heading "RE: CLAIM" and referenced the provision of the Plan that addressed the administrative claims procedure. (Pl.'s 56.1 Resp. ¶24; Ex. 1 to Denten Decl., Bates No. 00263, 0276, 00290, 00301, 00314, 00327, 00340.) These "claim" letters asserted that each Plaintiff had a right under Amendment 1 to obtain his full early retirement benefits "regardless of whether [I] remain employed by the Employer." (*Id.*) In this lawsuit, Plaintiffs continue to rely on the language of Amendment 1 and insist that they are entitled to receive their retirement pensions under the Plan's "30-and-out" provision immediately even though they remain actively employed by Finkl.

Defendants never initiated payment of Plaintiffs' claimed annuity benefits. Nor did the Plan ultimately distribute any of its assets to participants. Instead, on May 23, 2008, Finkl sent a letter to all participants informing them that the company had chosen not to terminate the Plan and, therefore, there would be no immediate distribution of assets. (Pl.'s 56.1 Resp. ¶ 25.) The letter makes clear that the company's decision to withdraw the termination was a direct response to

Plaintiffs' claims.  It states, in part:

> Unfortunately, as we have entered into this termination process, a small group of employees has asserted that they are entitled to more than the benefits that have been earned.  They have claimed that once they have completed 30 years of credited service, they should be able to collect their full pensions immediately, while at the same time remaining full-time employees.  Obviously such a result is not appropriate and was never intended, either under the Pension Plan prior to its termination or as a consequence of the termination process . . . . The group has threatened litigation if their demands are not met.  The Company is not interested in a dispute with any of its employees over this issue.  As a consequence thereof, the Company has notified the Pension Benefit Guaranty Corporation that it has withdrawn its termination of the Pension Plan.  As a result, benefits will be paid as in the past, as they come due under the terms of the Pension Plan.

(Ex. 1 to Denten Decl., Bates No. 00345-46.)  Defendants have not explained how it is that Plaintiffs' reading of Amendment 1 was "not appropriate and never intended."  If Finkl's initial "intent" was to exclude Plaintiffs from the group of employees who would receive immediate distributions "regardless of whether [they] remain[ed] employed by the Employer," Defendants have not explained this, either.  Nor have Defendants offered an alternative construction of Amendment 1 that contradicts Plaintiffs' reading.  Instead, the court surmises that Finkl simply failed to anticipate the nature of Plaintiffs' claims and, thus, did not accurately predict the Plan's potential liability upon termination.  According to Finkl's Human Resources Director Steven Denten, Finkl ultimately realized it had underestimated the Plan's outstanding obligations and "became concerned that the additional contribution Finkl would be required to make could be more than originally estimated." (Denten Decl., ¶ 6.)  Absent that additional contribution, Denten stated, the Plan's assets were insufficient to meet its anticipated liabilities upon termination. (*Id.*)  Four days after it received Plaintiffs' claim letters, Finkl announced its intention to abandon the termination process.

Plaintiffs insist that the Plan's assets were, in fact, sufficient to fund its obligations, but they have not demonstrated that there is a genuine dispute on this issue.  Plaintiffs point to an earlier filing with the PBGC in which Defendants certified the Plan's anticipated ability to provide for all benefits upon termination–a document that reflects Defendants' expectations at the time it was prepared, but does not rebut the assertion that Plan administrators ultimately concluded that Plan

would be incapable of meeting its full obligations absent further contributions from Finkl. (Certificate of Sufficiency, Ex. A to Pl.'s 56.1 Resp.)[6]

On May 27, 2008, Finkl amended the Plan a second time. The new amendment, hereafter referred to as Amendment 2, purported to negate Amendment 1 in its entirety. (Ex. 1 to Denten Decl., Bates No. 00360). In Defendants' view, Amendment 2 aborted the termination process and eliminated Finkl's obligation to immediately pay benefits or distribute Plan assets. Plaintiffs contend that Amendment 2 was ineffective to repeal the Plan's termination or to extinguish their right to receive immediate annuities pursuant to Amendment 1. On June 6, 2008, Plaintiffs' attorney wrote to Finkl's outside counsel, Larry Goldstein, asserting that Amendment 2 was invalid and that the purported change of course violated the anti-cutback provisions of ERISA. (Ex. 1 to Denten Decl., Bates No. 00351.) Plaintiff's counsel also asserted that Plaintiffs' claims for an immediate distribution of their benefits required resolution by the Plan's Pension Committee. (*Id.*) On June 18, 2008, Goldstein wrote back, stating, "[a]s a result of the withdrawal of the Plan's termination, none of [the Plaintiffs are] entitled to benefits currently and therefore each such claim for benefits is moot." (Ex. 1 to Denten Decl., Bates No. 00356-00363.)

The Pension Benefit Guaranty Corporation appears to have endorsed the company's position. In a letter dated June 6, 2008, the PBGC told Finkl, "we have withdrawn the termination. Accordingly, the Plan is an on-going Plan. Please note, you must notify participants, beneficiaries and any employee organization representing participants in writing that the Plan did not (or will not) terminate as of the proposed termination date stated in the notice of intent to terminate . . . . " (Ex. 1 to Denten Decl., Bates No. 00359.) The Plan resumed its normal operation, paying benefits to

---

[6]     The filing cited by Plaintiffs is an August 2007 document in which the Plan administrator was asked "Is the value of the plan assets projected to be sufficient as of the proposed distribution date to provide all plan benefits? If 'No,' the plan cannot terminate in a standard termination." Defendants answered that question "Yes." Defendants' subsequent extension requests to the PBGC, however, suggest that the Plan was still struggling to provide employees with a complete accounting of their benefits as late as February 2008, and Plaintiffs themselves now assert that Defendants underestimated the value of entitled benefits under the Plan.

participants as they came due.[7]

On November 24, 2008, Plaintiffs sent Goldstein a second letter, demanding that the Pension Committee review their May 19, 2008 claim forms in accordance with the Plan's claims procedure. (Pl.'s 56.1 Resp., ¶ 29.) Plaintiffs filed their first complaint in this lawsuit on December 15, 2008, before Goldstein or the Committee had the opportunity to respond to the November request for administrative review. (Complaint, D.E. 1.) The Pension Committee did ultimately consider Plaintiffs' claims and denied them in writing on December 22, 2008. (Pl.'s 56.1 Resp., ¶ 29; Ex. 1 to Denten Decl., Bates No. 00410-00412.) The Committee also considered Plaintiffs' administrative appeal, which it denied on March 26, 2009. (Pl.'s 56.1 Resp., ¶ 30.)

One further occurrence since the initiation of this litigation is important. On October 29, 2009, the IRS issued a favorable determination letter regarding the Plan's continued operation. The letter stated that the IRS had reviewed the Plan document, including Amendment 2's deletion of Amendment 1, and had determined that "the terms of the plan conform to the requirements" of the Internal Revenue Code, Section 401(a). (IRS Letter, Ex. 3 to Def.'s 56.1 Stat.) In other words, in the opinion of the IRS, the Plan continues to be an operational pension plan that is entitled to beneficial tax status under ERISA. The letter explicitly cautions that it relates "only to the status of [the Plan] under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes." (*Id.*) On February 1, 2010, Plaintiffs filed a Petition with the Clerk of the United States Tax Court, challenging the IRS's determination and the qualified tax status of the Plan on the ground that Amendment 2 violates the anti-cutback provision of the Revenue Code. (Pl.'s Supp. Mem. ¶ A.) As far as this court is aware, the Tax Court has, thus far, made no determination on Plaintiffs' challenge.

Defendants now move for summary judgment on all claims before this court, contending that Plaintiffs have failed to show that the Plan, Finkl, or any member of the Pension Committee has

---

[7]     It is unclear from the record whether Finkl was required to make a retroactive contribution to restore the Plan to fully-funded and operational status.

committed a violation of ERISA or a breach of the Plan's terms.  For the reasons explained below, the court grants Defendants' motions.

**DISCUSSION**

## I.      Standard of Review

Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgement as a matter of law.  FED. R. CIV. P. 56(c); *Zehrung v. United Auto Workers Local 663*, 269 Fed.Appx. 585, 588 (7th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  "In ERISA cases, denials of benefits are reviewed *de novo* unless the plan at issue gives the plan administrator discretion to construe the policy terms." *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009) (citing *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)).  When a plan administrator is given discretion to interpret the provisions of the plan, the administrator's decisions are reviewed using the arbitrary and capricious standard.  *See Wetzler*, 586 F.3d at 1057; *James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000).  Under that standard, the court accords the plan administrator "great deference" and will generally not disturb an administrator's decision if it is based on any "reasonable interpretation of the plan's language." *Wetzler*, 586 F.3d at 1057.

In this case, the Plan grants the Pension Committee "the exclusive right" and "complete discretion" to "interpret the terms and provisions of the Plan [and to] decide such questions as may arise in connection with the operation of the Plan, including . . . possible ambiguities, inequities, inconsistencies or omissions in the Plan or Trust by general rule or particular decision."  Thus, the Pension Committee's interpretation of the Plan is entitled to deferential review.  The issue of whether any particular term of the Plan violates ERISA is a question of law, however, and is therefore reviewed *de novo* by the court, without comparable deference to the plan administrator. *See Silvernail v. Ameritech Pension Plan*, 439 F.3d 355, 357 (7th Cir. 2006).  When deferential review of the plan administrator's benefit decision is called for under ERISA, the reviewing court's consideration is limited to the administrative record.  Otherwise, the court's decision is based on

all of the evidence before it.  *See Krolnik v. Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009).

## II.    General Principles of ERISA

In addressing the specific legal issues presented in this case, the court must be sensitive to the purposes that underlie ERISA.  First, the primary object of the Act is to protect "employees' justified expectations of receiving the benefits that their employers promise them."  *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).  "[W]hen Congress enacted ERISA, it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement–and if he has fulfilled whatever conditions are required to obtain a vested benefit–he actually will receive it.'" *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corporation,* 446 U.S. 359, 375 (1980)).  In short, ERISA is designed to protect and preserve promised pension benefits so that they will be available when plan participants need them.

Second, while ERISA is designed to ensure that employees receive the benefits they have been promised by their employer, the statute imposes no obligation upon employers to provide or maintain an ERISA plan in the first place.  *See Conkright v. Frommert*, 559 U.S. ___, ___ S.Ct. ____, 2010 WL 1558979, *7 (2010).   Instead, the statute *encourages* the *voluntary* creation of plans by providing tax incentives and by permitting plan administrators a measure of independence in the administration of plans.  *Id.* (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004)) (ERISA represents a "careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."); *See also Nachman Corp.,* 446 U.S. at 363 (ERISA seeks to "encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants."); 29 U.S.C. § 1392(a).  Thus, in enacting ERISA, Congress viewed the existence of employer-supported pension plans as positive and chose not to adopt a system so complex or unpredictable that administrative costs, or litigation expenses, would discourage employers from adopting and maintaining ERISA plans.  *See Conkright*, 559 U.S. at *7

(citing *Vanity Corp. v. Howe*, 516 U.S. 489, 497 (1996)).

Consistent with this congressional concern for ease of administration and predictability, ERISA requires that courts give great deference to the interpretations and regulations of the administrative agencies charged with enforcing and interpreting the statute: the PBGC, the IRS, and the Department of Labor. *See Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1167-68 (11th Cir. 1988); *Becker v. Weinberg Group, Inc.*, 473 F.Supp.2d 48, 69 (D.D.C. 2007) (quoting *Crowley Caribbean Transport, Inc. v. Pena,* 37 F.3d 671, 676 (D.C. Cir. 1994)) ("The PBGC's decision not to audit or issue a notice of noncompliance is analogous to the exercise of 'prosecutorial discretion' . . . Its discretion to not act in this case is a 'single-shot nonenforcement decision,' i.e., 'an agency's decision to decline enforcement in the context of an individual case,' and is unreviewable."). ERISA also recognizes that employers have "broad authority" to amend ERISA plans, and the Act prevents plan participants from seeking "extratextual remedies" that would have the effect of forcing termination or the premature distribution of a plan's assets. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442-47 (1999) (plan participants were not entitled to force an employer to terminate a plan, where the employer amended the plan to permit the entry of a new class of participants).

With these general principles in mind, the court turns to its consideration of the questions posed by this case.

### III.    Count I - Violation of Anti-Cutback Provisions

ERISA forbids the adoption of any plan amendment that works to decrease a participant's "accrued benefits" under the plan. 29 U.S.C. § 1054(g). Known as the anti-cutback rule, this statutory provision is"intended to prevent employers from pulling the rug out from under employees participating in a plan by preventing employers from eliminating benefits via a plan amendment." *Green v. Holland*, 480 F.3d 1216, 1228 (11th Cir. 2007) (internal quotations omitted). Plans also frequently include private anti-cutback language as a way of confirming participants' contractual protections. *See, e.g., Call v. Ameritech Management Pension Plan*, 475 F.3d 816, 819-21(7th Cir.

2007).

In Count I, Plaintiffs assert that the Plan's adoption of Amendment 2 and the Pension Committee's subsequent refusal to pay Plaintiffs immediate lifetime annuities violate ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), and comparable contractual protections in the Plan. Plaintiffs contend that Amendment 1 irrevocably abolished the requirement that employees actually retire before receiving the distribution of Plan benefits. They further assert that the immediate distribution of their benefits under Amendment 1 would have been more valuable to them than their benefits as reinstated under Amendment 2 because the immediate distribution would have been payable even while Plaintiffs continued to draw their full active wages. Thus, Plaintiffs reason, Defendants impermissibly reduced Plaintiffs' accrued benefits in violation of the anti-cutback rule by deleting Amendment 1 with Amendment 2.

In the court's view, Plaintiffs' claim involves two related questions. The first is whether the Plan's termination became effective before Defendants withdrew it, thereby vesting Plaintiffs with some form of entitlement under the Plan. As the court explains, the termination process was never completed, a fact that fatally undermines Plaintiffs' claim. The second question is whether, absent a completed termination, an immediate distribution of benefits to active employees is the type of benefit that the anti-cutback provisions of ERISA or the Plan contemplate or protect. The court concludes that it is not. Plaintiffs cannot succeed as a matter of law.

### A.     The Plan Did Not Terminate and Its Assets Were Not Distributed

As already stated, Plaintiffs assert an entitlement to the immediate distribution of their benefits, based on language from Amendment 1 that appears to contemplate payment of benefits to participants "regardless of whether [they] remained employed by the Employer." That language (like the rest of Amendment 1) applies "in connection with [the] distribution of benefits in accordance with [the Plan's] termination." (Ex. 1 to Denten Decl., Bates No. 00541-42.) The Pension Committee interpreted the language of Amendment 1 to mean that the Plaintiffs' claimed entitlement was conditioned on the Plan's actual termination and distribution of assets. (See Ex.

12

1 to Denten Decl., Bates No. 00410) ("[Amendment 1] outlined rights solely in connection with the termination of the Plan").  Because the Plan never actually terminated, the committee reasoned (and Defendants now repeat before this court), Plaintiffs obtained no right to an immediate distribution of their benefits.

Plaintiffs attack the conclusion that the Plan did not, in fact, terminate.  They assert that the Plan terminated by its terms on February 28, 2007, the effective date indicated in Amendment 1.  As of that date, Plaintiffs contend, Defendants were immediately and irrevocably obligated to distribute the Plan's assets and to pay Plaintiffs their claimed benefits.  The Pension Committee, the PBGC and the IRS were not persuaded by this argument, and neither is the court.  The Committee, the PBGC, and the IRS all agree that the Plan did not terminate in February 2007 but remains an active, ongoing Plan.  That determination appears to be reasonable.  On its face, Amendment 1 was designed to effectuate the Plan's termination process by implementing an equitable distribution of the Plan's assets.  Thus, it is reasonable to conclude that the Plan's actual termination was a necessary condition to the distribution of benefits contemplated by Amendment 1.  And, because that necessary condition was never fulfilled, Plaintiffs do not have a viable claim to compel distribution of their benefits before their actual retirements.

The question of whether a plan has terminated under its own provisions is a question of contract interpretation, which this court reviews only to see whether the administrator's determination was arbitrary or capricious.  *See Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 856-59 (7th Cir. 2002); *see also Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 311 (7th Cir.1992)).[8]

---

[8]     The *Fenster* case is instructive on the extent of deference a court must accord to an administrator's interpretation of a plan's provisions.  In that case, the plan provided that it would terminate upon "a complete discontinuance of contributions by [the] Employer."  *Fenster*, 301 F.3d at 859.  Prior to suit, the employer had terminated all of its employees and ceased making contributions to the plan.  It maintained no payroll and garnered no new business.  It had adopted a liquidation resolution, and its principals had separated to form different companies.  The employees argued that these facts led to the inevitable conclusion that the plan had terminated, but the administrator maintained that the plan was merely in "suspension" during the pendency of ERISA litigation.  *Id.* The Seventh Circuit accepted the administrator's contention and noted that the
(continued...)

Amendment 1 uses the term "termination" and the phrase "the time benefits are to be distributed" interchangeably. (Ex. 1 to Denten Decl., Bates No. 00541-42.) In giving meaning to Amendment 1's language, the Pension Committee appears to have interpreted "termination" to refer to the moment at which the Plan assets began being distributed. Because Finkl aborted the termination process before any Plan assets were distributed, the Pension Committee reasonably concluded that the Plan had not terminated under its own provisions and the deletion of Amendment 1 worked no reduction in benefits under the anti-cutback provisions of the Plan. The Committee's determination is consistent with the court's own reading of the Plan and the statutory requirements.

While ERISA provides no explicit guidelines for determining *when* a qualified plan has terminated, *see Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996); *In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199, 203 (3d Cir.1983), it does set out the exclusive *process* by which termination is carried out. 29 U.S.C. § 1341(a)(1); *Air Line Pilots Ass'n Intern. v. PBGC*, 193 F.Supp.2d. 209, 217 (D.D.C. 2002), *aff'd* 334 F.3d 93 (D.C. Cir. 2003). In this case, Finkl did initiate a voluntary termination under Section 1341. Under the authorized process, "the plan administrator–who in many cases is the employer itself–is granted the opportunity to determine when the employer's obligation to fund the plan ceases, when employees can no longer accrue benefits, and when [the] PBGC may be required to make good on its guarantee [to ensure the adequacy of the plan's assets]." *In re Syntex,* 698 F.2d at 203. The statute makes plain that a plan may terminate *"only if . . .* when the final distribution of assets occurs, the plan is sufficient for benefit liabilities (determined as of the termination date)." 29 U.S.C. § 1341(b)(1)(D)(emphasis added).

It is undisputed in this case that no distribution of the Plan's assets ever occurred, and the evidence before the court suggests that after announcing the termination, Finkl came to have

---

[8](...continued)
court lacked the power to terminate the plan on its own authority. *Id.*

legitimate concerns that the Plan might not have sufficient reserves to fund its liabilities when termination became final. Accordingly, Finkl proposed and the PBGC agreed to completely withdraw the termination and notify all participants before the deadline for a final distribution of assets. Thus, not all of the necessary requirements for ERISA's statutory termination process were satisfied in this case, and the termination process was not fully consummated. *See* 29 U.S.C. § 1341(b)(1); Rev. Rul. 89-87, 1989-2 C.B. 81 (1989) ("In order to terminate a qualified plan, the date of termination must be established, the benefits of plan participants and other liabilities under the plan must be determined with respect to the date of plan termination, *and all plan assets must be distributed to satisfy those liabilities* in accordance with the terms of the plan as soon as administratively feasible after the date of termination.") (emphasis added). In the absence of a complete satisfaction of the statutory termination process, this court will not indulge Plaintiffs' request for an "extratextual remedy" by forcing the Plan's termination or ordering an untimely distribution of the Plan's assets.

The court further concludes that, under ERISA, Finkl had the ability to withdraw the termination process by seeking and receiving the approval of the PBGC, the agency ERISA tasks with representing the interests of plan participants. In *Syntex*, the Third Circuit held that an employer who had initiated a voluntary termination under Section 1341 had "no discretion to change its mind" once the PBGC accepted its proposed termination date. *In re Syntex*, 689 F.2d at 204. The Court of Appeals explained that ERISA assumes that the "PBGC will act as guardian in the first instance of the interests of the fund and the plan's participants," and, absent a PBGC action to halt or withdraw a termination, the "only justification for allowing [an employer's] about-face would be to further the interests of the employer, a concern which is conspicuously absent from the statute." *Id.* In this case, in contrast, the PBGC was apprised of Finkl's desire to withdraw the termination, explicitly endorsed the Plan's non-termination, and acknowledged that the Plan remained an active and continuing ERISA plan.

Moreover, unlike the circumstances in *Syntex*, the non-termination of the Plan here does

not merely further the interests of the employer. The parties do not dispute that the Plan continues to meet its obligations to pay benefits as they come due. Hence, the Plan continues to fulfill its purpose of providing retirement income to its participants, who will receive their benefits as promised as a result of the Plan's continued operation. In contrast, the one-time distribution of benefits associated with the Plan's termination would have effectively halted any further accrual of benefits and excluded future Finkl employees from protection under the Plan. The PBGC's decision to withdraw the Plan's termination process appears to further ERISA's purpose of securing the broadest possible employee access to retirement benefits. The agency's actions in this case are, thus, consistent with its duty to protect the interests of participants and its obligation to "encourage the continuation and maintenance of voluntary private pension plans." 29 U.S.C. § 1392(a). This court owes deference to the PBGC's determination and declines to second guess it here.

The IRS has also determined that the Plan did not terminate and that no impermissible cutback occurred. Even though the IRS's determination relates only to the applicability of the Internal Revenue Code, the court accords substantial deference, as well, to the IRS's conclusion that Plan remains a fully-operational, tax-qualified plan. ERISA and the Internal Revenue Code contain identical anti-cutback provisions and federal regulations designate the Secretary of the Treasury, who oversees the IRS, as the "ultimate authority" in interpreting the anti-cutback provisions of both statutes. *See Central Laborers' Pension Fund,* 541 U.S. at 746-47.[9] While

---

[9] Plaintiffs' contention that the IRS's determination plays no role in interpreting ERISA's anti-cutback provision is incorrect. The IRS's role is, in fact, critical. As the Supreme Court explained in *Central Laborer's Pension Fund*:

When Title I of ERISA was enacted to impose substantive legal requirements on employee pension plans (including the anti-cutback rule), Title II of ERISA amended the Internal Revenue Code to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements. The result was a "curious duplicate structure" with nearly verbatim replication in the Internal Revenue Code of whole sections of text from Title I of ERISA. The anti-cutback rule of ERISA § 204(g) is one such section, showing up in substantially identical form as 26 U.S.C. § 411(d)(6). This duplication explains the provision of the Reorganization Plan No. 4 of 1978, § 101, 43 Fed.Reg. 47713 (1978), 92 Stat. 3790, giving the

(continued...)

Plaintiffs are free to pursue their challenge to the Plan's tax status in the U.S. Tax Court, this court takes no issue with the IRS's conclusion that the Plan remains a valid, ongoing, tax-protected pension plan.

A finding for Plaintiffs, on the other hand, would require that this court overlook the determinations of the PBGC, the IRS, and the Pension Committee's reasonable interpretation of its own Plan provisions. It would also require that the court declare an active, fully operational plan to be terminated, despite the fact that the Plan continues to meet its payment obligations and its termination process did not satisfy all of ERISA's procedural requirements. Perhaps recognizing that their request that the court compel termination is untenable, Plaintiffs propose that the court might somehow award them an immediate distribution of their benefits without forcing a complete termination of the Plan. The proposal has little appeal. Regardless of how a remedy might be fashioned, a finding for Plaintiffs would force at least the limited distribution, and possible depletion, of the Plan's assets in favor of a small subgroup of participants who are neither actually retired nor of appropriate retirement age. Such a distribution could risk placing the Plan's other participants (who are not parties to this action) in peril of having their benefits under the Plan altered or underfunded–a result at odds with the purposes of ERISA.

Moreover, as Defendants explain in their brief, Plaintiffs' receipt of pre-retirement benefit distributions at this point, in the absence of a complete forced termination of the Plan, would jeopardize the Plan's protected tax status. Under Section 401(a) of the Income Tax Regulations, a qualified ERISA plan must "provide for the livelihood of the employees or their beneficiaries after the retirement of such employees . . . ." 26 C.F.R. § 1.401-1(a). With limited exceptions that are

---

[9](...continued)
Secretary of the Treasury the ultimate authority to interpret these overlapping anti-cutback provisions. Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g).

541 U.S. at 746-47.

not applicable in this case, a plan that distributes benefits to employees "prior to any severance of employment or the termination of the plan" will fail to comply with the requirements of Section 401(a) and lose its protected status. Rev. Rul. 60-323, 1960-2 C.B. 148 (1960).[10] As already stated, the IRS and PBGC have determined that the Finkl Plan has not terminated. Thus, the distribution of benefits to Plaintiffs, who remain active employees, would violate the revenue code and potentially result in the forfeiture of the Plan's protected tax status. If a plan loses its protected status, employer contributions become immediately taxable to the participants to whom they are owed, removing incentives for employer and employee to continue their participation in the Plan. 26 C.F.R. § 1.402(b)-1. Because the Finkl Plan has not terminated, the distribution that Plaintiffs seek at this point could place the Plan in non-compliance with Section 401(a), and expose the Plan and its participants to immediate tax liability.

The relief that Plaintiffs seek would deplete the Plan's assets, could disqualify the Plan from beneficial tax status, and might all but compel the Plan's termination, potentially to the detriment of the majority of the participants. The court will not impose a result so contrary to the text and purposes of ERISA. Nor does the law compel such as result, as the Plan did not terminate and Plaintiffs' claimed entitlement did not become effective.

**B.    Anti-Cutback Rules Do Not Protect a Right to Receive Benefits Before Retirement**

In addition, the benefit that Plaintiffs seek to protect is not the type of benefit that ERISA's anti-cutback rule contemplates or safeguards. As the court understands Plaintiffs' argument, the benefit Plaintiffs claim to be deprived of is solely the ability to receive annuity distributions from a retirement plan while simultaneously remaining gainfully employed by the plan's sponsor. Such an interest is not obviously protected by the anti-cutback provision, which is aimed at protecting and

---

[10]    Notably, the tax regulations permit the payment of benefits pursuant to "termination of the plan." Thus, had the Finkl Plan fully and completely terminated on the proposed termination date in February 2007, the distribution of benefits at that time would not have undermined the Plan's tax status. A distribution of benefits at this point, however, after the IRS has adjudged the Plan to be active and ongoing, would violate the terms of Section 401(a).

preserving the availability of benefits at the point of a participant's actual retirement or the achievement of a designated retirement age.

As already stated, ERISA prohibits plan amendments that decrease the accrued benefits of participants. 29 U.S.C. § 1054(g). The Plan itself also contains an anti-cutback provision that tracks ERISA's language, and the Pension Committee appears to have interpreted that provision as consistent with ERISA's definition of an accrued benefit.[11] The statute defines "accrued benefit" as any "annual benefit *commencing at normal retirement age.*" 29 U.S.C. § 1002(23) (emphasis added). The rights claimed by Plaintiffs in this case cannot be accurately characterized as accrued benefits commencing at normal retirement age, as they would result in the immediate payment of benefits regardless of each Plaintiffs' age, retirement status, or the active status of the Plan. Nor can Plaintiffs' claimed entitlement be properly understood as an "early retirement benefit" or "a retirement-type subsidy," as ERISA's anti-cutback provision uses those terms under 29 U.S.C. § 1054(g)(2), since the terms themselves imply *retirement* as a necessary condition for the receipt of a contemplated benefit. "Early retirement benefits are generally benefits that become available upon retirement at or after a specified age which is below the normal retirement age, and/or upon completion of a specified period of service." *Ross v. Pension Plan for Hourly Employers of SKF Industries, Inc.*, 847 F.2d 329, 333 (6th Cir. 1988). The provision that a plan may pay pre-retirement benefits under ERISA pursuant to its termination is a rare exception to the general rule that an employee must actually retire or reach a designated age to receive benefits. As the court has already explained, that exception is not applicable here since the Finkl Plan continues to operate and pay benefits as promised.

A requirement that an employee cease working before receiving retirement benefits makes eminent sense. "Companies encourage early retirement in order to make room for 'fresh blood.'"

---

[11]     The Plan language reads, in part: "No pension benefit already accrued at the time of such revocation, termination, amendment, alteration, modification, or suspension shall be discontinued or reduced thereby." (Article XI of the Plan, Ex. 1 to Denten Decl., Bates No. 00080.)

*Call,* 475 F.3d at 822. A construction of the Plan that would entitle Plaintiffs to an immediate distribution of benefits before their actual retirements would undermine the incentives supporting an "early retirement" option and would render the very concept underlying this form of benefit meaningless. "There is a long tradition in contract law of reading contracts sensibly . . . ." *Id.* (quoting *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir.2001)). Plaintiffs' claimed entitlement cannot sensibly be construed as an early retirement benefit. Nor can Plaintiffs' claimed entitlement be characterized as a "retirement-type subsidy," defined as a "subsidy that continues after retirement." *Ross* , 847 F.2d at 333, (citing S.Rep. No. 575, 98th Cong., 2d Sess. 30.) According to the Seventh Circuit, this form of "retirement benefit" requires that "payment begins at normal retirement age." *See Arndt v. Security Bank S.S.B. Employees' Pension Plan,* 182 F.3d 538, 543 (7th Cir. 1999). Plaintiffs in this case have not retired, have not completed their employment with Finkl, have not reached the Plan's retirement age, and continue to enjoy active employment for full compensation.

In every category of benefit contemplated by ERISA's anti-cutback provision, the statute implies a required condition of actual retirement or the attainment of a designated retirement age.[12] Plaintiffs do not satisfy either condition. They acknowledge that Amendment 2 did not eliminate or reduce their rights to ultimately receive retirement benefits and did not change the way their benefits will be calculated. Instead, they complain only that they will be unable to access their benefits until such time as they actually retire.

The court concludes Plaintiffs have not been deprived of rights protected by ERISA. They

---

[12] ERISA's anti-cutback provision also applies to amendments which have the effect of "eliminating an optional form of benefit." 29 U.S.C. § 1054. "An optional form of benefit is generally one that involves the power or right of an employee to choose the way in which payments due to him under a plan will be made or applied," such as the ability to choose a lump sum or an annuity payment. *Ross,* 847 F.2d at 333. Plaintiffs have not argued that the right to elect an immediate annuity was an "optional benefit" under the Plan. Any such argument would fail, as the statutory provision applies only to amendments which entirely "eliminat[e]" the optional benefit. The effect of Amendment 2 was only to defer the payment of benefits until such time as Plaintiffs actually retired from employment. Amendment 2 did not alter the way in which payment of the 30-and-out annuity benefit was to be made or applied.

have not demonstrated that they ever held a "justified expectation" of receiving retirement benefits while remaining full employees of Finkl and participants in the company's active pension plan, and they have neither alleged nor presented evidence that they undertook acts in detrimental reliance on the language of Amendment 1. Any expectation on Plaintiffs' part that they were entitled to receive full benefits while maintaining full employment became unreasonable in light of the Plan's non-termination. Nor do Plaintiffs appear to have suffered any harm as a result of the Plan's continued operation; by Plaintiffs' own account, the Plan is able and willing to pay their promised benefits in full. Plaintiffs merely have to wait until such time as they actually retire to begin collecting those benefits.

In short, the court is unwilling to conclude that the anti-cutback provision of ERISA mandates the result for which Plaintiffs are arguing–effectively a premature distribution of their full retirement benefits under an active Plan. Accordingly, the court grants Defendants' motion for summary judgment on Count I.

## IV.    Count II - Action to Enforce Rights Under the Plan

In Count II of the amended complaint, Plaintiffs contend that the Plan's Pension Committee violated the Plan's administrative claims procedure by improperly ignoring Plaintiffs' claims. Section 10.1 of the Summary Plan Description, which describes the administrative procedure, states:

> [I]f you think an error has been made in determining your benefits, then you may make a claim for any Plan benefits to which you believe you are entitled. Any such request should be in writing and should be made to the Pension Committee . . . . If your claim is wholly or partially denied, the Pension Committee will furnish you with a written notice or electronic notification of its adverse determination. This written or electronic notification must be provided to you within a reasonable period of time, but not later than 90 days after the receipt of your claim by the Pension Committee . . .

(Ex. 1 to Denten Decl., Bates No. 00568-00569.) Plaintiffs originally sought two forms of relief on Count II: (1) a mandatory injunction compelling the Pension Committee to process the claims, and (2) the award of reasonable attorneys' fees pursuant to 29 U.S.C § 1132(g)(1). (Amended Complaint, D.E. 28, ¶ 29-31.) Plaintiffs now acknowledge that the Pension Committee's

consideration and denial of their claims in December 2008 render the request for a mandatory injunction moot. They continue to demand reasonable attorneys' fees, however, on the theory that the committee's initial unresponsiveness compelled Plaintiffs to seek redress by filing this lawsuit. In deciding whether an award of attorneys' fees is appropriate under Section 1132 (g)(1), the court asks whether the Pension Committee's "position [was] substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *See Herman v. Central States*, 423 F.23 F.3d 684, 696 (7th Cir. 2005) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).[13]

As already described, each Plaintiff filed a separate claim for benefits on May 19, 2008, in conjunction with the return of a benefit election form seeking an immediate distribution of benefits based on the language of Amendment 1. Just four days later, on May 23, 2008, the company notified all of the Plan's participants that the Plan would not be terminating and that no participant would be receiving an immediate distribution of benefits. Finkl's May 23 letter, which was signed by Finkl's President and Pension Committee member Joseph Curci, specifically referenced Plaintiffs' claims and left no doubt that the company considered those claims to be invalid. On June 6, 2008, Plaintiffs' counsel wrote to Finkl's outside counsel Larry Goldstein–not to the Pension Committee–to declare that Plaintiffs were not satisfied and to assert that Plaintiffs considered their benefit claims to be "pending." Twelve days later, Goldstein replied with Defendants' position that the claims were "moot." Plaintiffs took no further action until November 24, 2008, when Plaintiffs' counsel wrote again to Goldstein to formally request that the Pension Committee consider the May 19 claims under the resolution process set forth in Section 10.1. Plaintiffs filed this lawsuit on

---

[13]    The extended five-part test, set out in numerous cases, instructs the court to consider the following factors: (1) the degree of the offending parties' culpability or bad faith, (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *See Brewer v. Protexall, Inc.*, 50 F.3d 453, 458 (7th Cir. 1995). Here, the court concludes that Defendants have neither acted with bad faith nor displayed culpable conduct that must be deterred with an award of attorneys' fees.

December 15, 2008, and the Pension Committee formally denied Plaintiffs' claims on December 22, 2008. The Committee has also considered and rejected Plaintiffs' administrative appeal of the decision denying the claims.

The Plan's 90-day response deadline, a contractual term, serves the purpose of keeping participants adequately informed of the status of their claims and encouraging the speedy resolution of claim disputes. Though the Pension Committee did not, itself, render a technically timely formal response to Plaintiffs' initial May 19, 2008 claims, those purposes of the contractual term were clearly met. Representatives of the Pension Committee and Finkl gave Plaintiffs ample notice that they considered Plaintiffs' claims to be invalid. Just four days after Plaintiffs submitted their initial claim letters, the company notified them that the termination which was the predicate for those claims was no longer taking place. Goldstein said the same when he replied to Plaintiffs' June letter. Plaintiffs themselves took no further action in response to Goldstein's letter for almost five months. When Plaintiffs did properly invoke the Section 10.1 claim resolution process a second time to address their anti-cutback claims, the Pension Committee promptly responded by considering Plaintiffs' claims within 28 days in accordance with its contractual obligations.

Under these circumstances, the court concludes that Defendants acted in good faith to comply with the requirements of the claim resolution procedure and to respond to Plaintiffs' claims in an evolving situation. Plaintiffs' initial May 19 claims arguably merited a more formal and individualized response from the Pension Committee under the resolution procedure, but Defendants did not ignore Plaintiffs in an effort to harass them or to compel initiation of litigation. Indeed, in light of the major focus of this lawsuit–a challenge to Defendants' right to proceed with Amendment 2–it appears Plaintiffs preferred to take their fight to the courts. Plaintiffs waited less than three weeks, after sending their demand letter of November 24, 2008, before filing this case.

Given the absence of bad faith or culpable conduct on the part of Defendants, an award of attorneys' fees under Section 1132(g)(1) would be inappropriate. As attorneys' fees are now the sole relief that Plaintiffs seek on Claim II, Defendants' motion for summary judgment on this claim

is granted. Plaintiffs' cross-motion for summary judgment is denied.

## V. Count III – Calculation of Plaintiffs' Benefits

The final Count of the complaint alleges that Defendants violated ERISA by undervaluing Plaintiffs' benefits in several ways. First, Plaintiffs allege that the Plan administrator incorrectly calculated their covered compensation under the Plan by improperly excluding their bonuses from the benefit formula. Second, Plaintiff Paul Miles asserts that the Plan administrator erred when it calculated his benefits under a court-imposed qualified domestic relations order. Finally, Plaintiff John McFawn alleges that Defendants underestimated miscellaneous cost of living and travel adjustments to his compensation when calculating his benefit. As the court explains, Plaintiffs have produced no evidence to support the first of these allegations, and Mr. Miles's and Mr. McFawn's concerns have been resolved by agreement of the parties.

### A. Special Bonuses Calculation

Prior to 1991, the Plan's pension formula did not credit any form of discretionary bonus toward the calculation of a participant's benefits. (Denten Decl. ¶ 8-9.) In 1991, however, Finkl adopted a system that designated employee bonuses as either "regular bonuses" or "special bonuses," and the company amended the Plan to exclude only special bonuses from the pension formula, while allowing regular bonuses to count toward benefit calculations.[14] (Pl.'s 56.1 Resp. ¶ 10-11; Denten Decl. ¶ ¶ 8, 11; Ex. 1 to Denten Decl., Bates No. 00478.) In calculating Plaintiff's benefits, the Plan administrator identified many bonuses Plaintiffs had received as special bonuses and excluded them from the pension formula. Plaintiffs do not dispute that the Plan's terms explicitly exclude special bonuses form the pension formula. Instead, they allege that Defendants shortchanged them when calculating benefits by incorrectly designating Plaintiffs' regular bonuses

---

[14]     In their 56.1 Response, Plaintiffs neither admit nor deny these statements. (Pl.'s 56.1 Resp. ¶ 10-11.) Instead, Plaintiffs state only "No response." (*Id.*) The court deems these facts to be admitted.

as special bonuses on an "ex post facto" basis.

Defendants deny the allegation and present internal payroll records that were compiled contemporaneously with payment of Plaintiffs' bonuses. (Denten Decl. ¶ 10; Ex. 1 to Denten Decl. Bates No. 00596-00765.) The records contain columns headed "Regular" and "Special" above numerical figures that reflect Plaintiffs' bonus values for each category. (*Id.*) The Pension Committee's benefit decision is based on these records. According to Steven Denten, Finkl's managers had "unfettered discretion" to designate any bonus as either special or regular at the time it was paid to an employee. (Denten Decl. ¶ 10.) Employees who received both special and regular bonuses were paid with separate checks, Denten said, and the supervisors who distributed the checks were expected to explain to employees which check was for which form of bonus. (*Id.*) Defendants argue that this evidence establishes that the Defendants correctly calculated Plaintiffs' benefits based on the explicit terms of the Plan and Finkl's records indicating the designation of each bonus.

In response, Plaintiffs assert that they were not previously aware of any of the internal policies or records that Defendants now present. In an affidavit, Plaintiff Curlee Thomas asserts that he was never informed by his superiors that his bonuses were designated as "special" and that, prior to making his benefit claim, he had never seen the company's payroll records. (Pl.'s 56.1 Resp. ¶ 13; Thomas Aff. 5-8.) Plaintiffs present no other evidence challenging either the veracity of Denten's statements or the accuracy of the records provided to the court.

The Federal Rules require that a party opposing summary judgment set out specific facts showing a genuine issue for trial. FED. R. CIV. P. 56(e)(2); *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000) ("[T]he nonmoving party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact."). All that Plaintiffs have offered on this issue is the statement of a single employee that he was unaware of Finkl's bonus policy. That evidence, even when viewed in the light most favorable to Plaintiffs, does not support the inference that Denten's sworn statements describing the policy are untrue or that the internal records

reflecting the policy are inaccurate. While Plaintiffs insist that Denten "misreads [the] payroll records which use the term 'Regular' and 'Special' for reporting compensation, generally," Plaintiffs offer no evidence for or explanation of their alternative reading. (Def.'s Br. at 9.) One would reasonably expect that Mr. Denten, Finkl's Director of Human Resources and Controller, is capable of accurately reading Finkl's payroll documents, and Plaintiffs do not suggest otherwise or explain how Denten's conclusions are flawed. Having had substantial opportunity for discovery, Plaintiffs are not free to rely merely on unsupported allegations to rebut Defendants' substantial documentary and testimonial evidence. *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) ("Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, set[ting] forth specific facts showing that there is a genuine issue for trial. The evidence must create more than some metaphysical doubt as to material facts") (internal citation omitted). Defendants have presented evidence that the Plan administrator properly calculated Plaintiffs' benefits based on payroll records and the Plan's explicit policy of differentiating between special and regular bonuses. As Plaintiffs have presented no evidence to the contrary, summary judgment for Defendants is appropriate.

### B. Plaintiff Miles' QDRO

As the court explained in a previous order, Plaintiff Miles's pension benefits are subject to a qualified domestic relations order ("QDRO") as a term of his divorce from his former spouse, Esther Miles. *See Carter v. Pension Plan of A. Finkl & Sons Co.*, No. 08 C 7169, 2009 WL 5066649, *5 (N.D.Ill. Dec. 17, 2009). The QDRO entitles Esther to half of any benefits Miles accrued under the Plan before August 28, 2006. At the commencement of this lawsuit, Plaintiff Miles complained that the Plan incorrectly estimated the division of benefits under the QDRO. Defendants have since acknowledged that they committed an error by assuming the Esther's entitlement continued beyond August 28, 2006, and the parties have reached an accord as to how the QDRO should be administered in the future. Nevertheless, Miles asserts that he has been

harmed by Defendants' actions because "he was required to litigate, incurring legal fees and costs, in order to have his QDRO properly administered." (Pl.'s 56.1 Resp. at ¶ 18.)

At the outset of this case, Defendants initially moved for Rule 12 dismissal of Miles's claim because, they argued, Miles had not exhausted the Plan's administrative claims procedure by presenting his claim to the Pension Committee. The court denied Defendants' motion on the basis that Plaintiffs had adequately alleged exhaustion of administrative review. *Carter*, 2009 WL 5066649, at *5.[15] On summary judgment, however, Plaintiffs must do more than simply rely on the allegations of their complaint. Defendants' evidence shows that "Miles has not submitted any written administrative claim or administrative appeal to the Pension Committee regarding his QDRO." (Denten Decl. ¶ 15.) Again, Plaintiff has produced no contrary evidence, nor even responded to this statement in its Rule 56.1 Response. (Pl.'s 56.1 Resp. ¶ 17.)

"An ERISA plaintiff must exhaust all available administrative remedies before filing suit to challenge a denial of benefits." *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 662 (citing *Zhou v. Guardian Life Ins. Co. of America*, 295 F.3d 677, 679 (7th Cir. 2002)). The evidence in this case is that Miles did not exhaust administrative remedies. He cannot now argue that he was required to litigate when he did not avail himself of the administrative procedure. Summary judgment is granted as to this claim.

### C.   McFawn's Benefits

The parties now agree that the Plan successfully resolved all of McFawn's claims for benefits in April 2008, more than seven months before Plaintiffs filed this complaint. (Pl.'s 56.1 Stat. ¶ 22, Def.'s Rep. at 14.) As the Plan has resolved all of McFawn's claims to his satisfaction, there is nothing left for the court to do and no ERISA action lies.

### CONCLUSION

---

[15]    Plaintiffs had alleged that the Plan denied their claims "in full," which the court took to imply that "Plaintiffs had fully and fairly presented their understatement claims in administrative proceedings." *Carter*, 2009 WL 5066649, at *5.

Defendants' motions for summary judgment [56, 60] are granted as to all claims.  Plaintiffs' cross-motion for summary judgment on Count II [50] is denied.


ENTER:

Dated:  May 12, 2010
_____
REBECCA R. PALLMEYER
United States District Judge